# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANAHER CORPORATION,

        Plaintiff,

   vs.

THE TRAVELERS INDEMNITY
COMPANY, et al.,

        Defendants.

**Case No.  10-CIV-0121 (JPO) (JCF)**

---

## BRIEF IN SUPPORT OF DANAHER CORPORATION'S AND ATLAS COPCO NORTH AMERICA LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND APPLICATION FOR SUPPLEMENTAL ALLOCATION PROCEEDINGS

---

**McCARTER & ENGLISH, LLP**
Worldwide Plaza
825 Eighth Ave., 31st Floor
New York, NY 10019
Phone: 212.609.6800
Fax: 212.609.6921
Attorneys for Plaintiff
Danaher Corporation

**REED SMITH LLP**
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Phone: 212.521.5400
Fax: 212.521.5450
Attorneys for Third-Party Defendant
Atlas Copco North America LLC

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................................1

    I.  Allocation Issues ....................................................................................................1

    II.  Lack of Aggregate Limits in Travelers' January 1, 1970 and
January 1, 1973 Primary Policies......................................................................2

    III. Missing Aetna Primary Policies...........................................................................2

BACKGROUND

    I.  CPTC'S INSURANCE POLICIES..................................................................2

        A.    Travelers' and Aetna's Primary Insurance Policies.................................2

        B.    CPTC's Umbrella and Excess Policies ....................................................3

    II.  The Asbestos and Silica Claims Against CPTC ................................................4

PROCEDURAL HISTORY

    I.  Travelers' Breach of the Duty To Defend ..........................................................4

    II.  The Court's Award of Outstanding Defense Expenses and Prejudgment Interest ..............4

    III. Adjournment of Prior Dispositive Motions ........................................................5

    IV. Current Procedural Posture ..................................................................................5

ARGUMENT

POINT I

AN "ALL SUMS" ALLOCATION GOVERNS CPTC'S INSURANCE  POLICIES
WITH NON-CUMULATION CLAUSES, WHILE A PRO RATA ALLOCATION
APPLIES TO ALL REMAINING POLICIES ......................................................................6

    A. Allocation Under New York Law:  From Pro Rata to "All Sums" .....................6

    B. Viking Pump Applies to CPTC's Policies with Non-Cumulation Clauses .........8

    C. The Allocation Applicable to CPTC's Insurance Policies..................................9

ME1 27202270v.9

    D. The Court Should Order Supplemental Allocation Proceedings To Establish an Amount Certain Owed by the Insurers for Past Settlements .........................11

POINT II

TRAVELERS' POLICY NUMBERS TNSL 4892615, TNSL-951420-71, AND TNSL 951 420-72 CONTAIN NO AGGREGATE LIMIT APPLICABLE TO THE ASBESTOS AND SILICA LAWSUITS......................................................................................12

    A. The Policies Plainly Provide No Aggregate Limit ............................................13

    B. Travelers' Corporate Designee Acknowledged the Policies Have No Aggregate Limit .............................................................................................14

    C. Travelers Cannot Avoid Summary Judgment by Citing External Evidence ......................15

        1. Travelers Cannot Create Ambiguity Through Extrinsic Evidence .......................15

        2. Continental's and American Home's Policies, in Any Event, Do Not Aid in Interpreting Travelers' Policies ..................................................16

        3. Even if Ambiguity Exists, the Court Must Construe It in Favor of Coverage.......16

POINT III

SECONDARY EVIDENCE ESTABLISHES THE EXISTENCE, TERMS, AND CONDITIONS OF MISSING PRIMARY COVERAGE ISSUED BY AETNA .........................16

    A. Movants May Prove the Lost Policies Through Secondary Evidence..............................17

    B. Movants Diligently Searched for the Missing Policies.....................................................18

    C. Secondary Evidence Proves the Missing Aetna Coverage ...............................................18

        1. Documentary Evidence and Oral Testimony Prove Aetna's Coverage Between December 31, 1946 and January 1, 1954.................................................19

        2. Documentary Evidence Proves Aetna Sold Coverage after January 1, 1956........20

        3. Oral Testimony by CPTC's Former Treasurer Proves Aetna Sold Primary Coverage to CPTC Each Year Between 1942 and 1966 .................21

        4. Mr. Stern's Testimony Establishes the Limits of Aetna's Policies ......................22

    D. Policy Forms Produced by Travelers Establish the Terms of the Missing Policies ..........23

CONCLUSION.................................................................................................................................24

ME1 27202270v.9

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Burroughs Wellcome Co. v. Comm. Union Ins. Co.,*
632 F. Supp. 1213 (S.D.N.Y. 1986).................................................................17, 24

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,*
302 F.3d 83 (2d Cir. 2002).................................................................17, 18

*Cadet Mfg. Co. v. Am. Ins. Co.,*
391 F. Supp. 2d 884 (W.D. Wash. 2005).................................................................14

*Carey-Canada, Inc. v. Cal. Union Ins. Co.,*
No. 83-1106, 1984 U.S. Dist. LEXIS 17510 (D.D.C. Apr. 17, 1984).................................24

*Emerson Enter., LLC v. Crosby,*
No. 03-CV-6530 CJS, 2007 WL 4118299 (W.D.N.Y. Nov, 14, 2007)................................17

*Glew v. Cigna Grp. Ins.,*
590 F. Supp. 2d 395 (E.D.N.Y. 2008) .................................................................17

*Olin Corp. v. OneBeacon Am. Ins. Co.,*
864 F.3d 130 (2d Cir. 2017).................................................................8, 10

**STATE CASES**

*Cragg v. Allstate Indem. Corp.,*
17 N.Y.3d 118 (2011) .................................................................13

*Consol. Edison Co. of N.Y. v. Allstate Ins. Co.,*
98 N.Y.2d 208, 224 (2002) .................................................................6, 7, 9

*Continental Cas. Co. v. Rapid-Am. Corp.,*
80 N.Y.2d 640, 655 (1993) .................................................................10

*Estee Lauder Inc. v. OneBeacon Ins. Gp., LLC,*
873 N.Y.S.2d 592 (N.Y. App. Div. 2009) .................................................................22

*Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.,*
661 N.Y.S.2d 948 (N.Y. Cty. 1997) .................................................................17

*In the Matter of Viking Pump, Inc.,*
27 N.Y.3d 244 (2016) .................................................................1, 6, 7, 8, 9, 10

*Metropolitan Prop. & Cas. Ins. Co. v. Mancuso,*
93 N.Y.2d 487 (1999) .................................................................16

iv

*Ne. Utils. v. Century Indem. Co.*,
  Nos. X03CV 990495495S, X03CV 980495496S, 1999 WL 476274
  (Conn. Super. Ct. June 21, 1999) ............................................................................ 23

*U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*,
  20 N.Y.3d 407 (2013) ............................................................................................ 14

*Vigilant Ins. Co. v. Bear Stearns Cos.*,
  10 N.Y.3d 170 (2008) ............................................................................................ 13

*White v. Cont'l Cas. Co.*,
  9 N.Y.3d 264 (2007) .............................................................................................. 13

**STATE STATUTES**

C.P.L.R. § 5004 ............................................................................................................ 11

ME1 27202270v.9

## PRELIMINARY STATEMENT

In 2012, this Court determined responsibility for fees and costs expended to defend asbestos and silica lawsuits filed against Chicago Pneumatic Tool Company ("CPTC"), a former subsidiary of Danaher Corporation ("Danaher") and a current subsidiary of Atlas Copco North America LLC ("Atlas Copco").  Specifically, the Court ruled that CPTC's primary insurer, The Travelers Indemnity Company ("Travelers"),[1] must fund all defense fees and costs as long as any of its unexhausted primary policies is triggered by an asbestos or silica bodily injury claim.  In this motion, Danaher and Atlas Copco (collectively, "Movants") seek partial summary judgment regarding:  (1) remaining allocation issues; (2) the lack of aggregate limits for bodily injuries in Travelers' primary policies between January 1, 1970 and January 1, 1973; and (3) the existence of missing primary policies issued by Aetna.

## I.      Allocation Issues

Movants seek rulings regarding the allocation of CPTC's losses consistent with the New York Court of Appeals' decision in *In the Matter of Viking Pump, Inc.*, 27 N.Y.3d 244 (2016). Pursuant to that decision, the Court should order that an "all sums" allocation governs CPTC's unexhausted insurance policies containing non-cumulation clauses and that a *pro rata* allocation applies to settlements and judgments triggering Travelers' unexhausted primary policies without non-cumulation clauses.  Finally, Movants request that the Court order supplemental proceedings to determine the appropriate amount of past settlements allocable to each policy based upon the legal framework established by *Viking Pump* and this Court's rulings on the dispositive motions.

---

[1] "Travelers" in this Brief includes The Travelers Indemnity Company and its predecessor-in-interest, The Aetna Casualty and Surety Company ("Aetna").

ME1 27202270v.9

II.   **Lack of Aggregate Limits in Travelers' January 1, 1970 and January 1, 1973 Primary Policies**

Movants also seek an order that Travelers' three successive primary policies between January 1, 1970 and January 1, 1973 do not contain aggregate limits applicable to bodily injury lawsuits. Despite the admission of Travelers' corporate designee at his deposition, Travelers has not yet acknowledged these policies do not have aggregate limits.

III.   **Missing Aetna Primary Policies**

Finally, Travelers disputes that Aetna issued primary coverage to CPTC between December 31, 1946 and January 1, 1961 and from January 1, 1962 to January 1, 1963. Secondary evidence, however, establishes the existence, limits, and terms of the policies. Asbestos and silica exclusions did not exist at the time and, in any event, Travelers cannot meet its burden to prove any such exclusion applies.

## BACKGROUND

I.   **CPTC'S INSURANCE POLICIES**

A.   **Travelers' and Aetna's Primary Insurance Policies**

Travelers and its predecessor-in-interest, Aetna, sold primary commercial general liability insurance policies to CPTC, although the parties dispute the full extent of the coverage. Travelers acknowledges that it sold successive primary policies to CPTC from January 1, 1970 to April 1, 1986.[2] Declaration of Adam J. Budesheim ("Budesheim Dec."), Ex. 1. Travelers also acknowledges that Aetna issued primary coverage to CPTC from January 1, 1961 to January 1, 1962 and from January 1, 1963 through January 1, 1970 (but denies knowledge of the policies' limits). *Id.* Although copies of the policies have not been located, Travelers has paid claims

---

[2] Travelers contends its policies from April 1, 1979 through April 1, 1985 have exhausted their limits of liability. Dkt. No. 336 at 5-6.

2

under those Aetna policies, as demonstrated by the loss runs produced by Travelers in this action. Budesheim Dec., Ex. 2.

Travelers disputes that Aetna sold any other primary policies to CPTC. Secondary evidence, however, demonstrates that Aetna sold CPTC primary policies between December 31, 1946 and January 1, 1961 and between January 1, 1962 and January 1, 1963. Testimony exists that Aetna sold coverage to CPTC dating back to the 1930s, but, as a practical matter, Movants limit this application to the time period specified because earlier coverage would be immaterial to Movants' recovery.

**B.     CPTC's Umbrella and Excess Policies**

In addition to primary coverage, CPTC purchased umbrella and excess liability coverage from other insurers who are defendants in this action between April 7, 1972 and April 1, 1986 without asbestos exclusions. Nearly all of CPTC's umbrella and excess policies during that period contain non-cumulation clauses similar to the following provision in North River Insurance Company's ("North River") umbrella policy JU0179:

> C. PRIOR INSURANCE NON CUMULATION OF LIABILITY
>
> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

Budesheim Dec., Ex. 3. For the convenience of the Court, Appendix "A" identifies CPTC's umbrella and excess policies with non-cumulation clauses.[3]

---

[3] Due to their volume, Movants have not submitted copies of all policies on Appendix "A," but will submit them if requested by the Court.

ME1 27202270v.9

II.     **The Asbestos and Silica Claims Against CPTC**

CPTC has been named a defendant in hundreds of lawsuits claiming bodily injury resulting from exposure to asbestos or silica through the use of CPTC's products. Through April 2014, CPTC incurred over $8,720,181.85 in fees and costs defending the asbestos and silica claims. Dkt. No. 295. As of May 30, 2018, CPTC incurred $141,000 in settlement of the silica claims and more than $1.9 million in settlement of the asbestos claims. There are no pending silica claims against CPTC.

## PROCEDURAL HISTORY

I.      **Travelers' Breach of the Duty To Defend**

On August 18, 2011, Movants sought partial summary judgment regarding Travelers' duty to defend asbestos and silica lawsuits filed against CPTC under the primary policies issued by Travelers and Aetna. Dkt. Nos. 53-57. The Court granted the motion following oral argument on September 6, 2012, ruling that Travelers breached its policies in failing to reimburse Movants' defense expenses. Dkt. No. 227-1 at 57:1-61:8. By Order dated September 7, 2012, the Court also ordered Travelers to provide a defense for pending and future asbestos and silica lawsuits. Dkt. No. 98.

II.     **The Court's Award of Outstanding Defense Expenses and Prejudgment Interest**

By Amended Opinion and Order dated March 21, 2014, the Court referred the dispute regarding the reasonableness of past defense fees and costs, as well as pre-judgment interest, to the Honorable James C. Francis, IV, U.S.M.J. Dkt. No. 189 at 14. Movants filed their motion to establish the amount of defense expenses Travelers was required to reimburse and for prejudgment interest pursuant to New York law on August 1, 2014. Dkt. Nos. 225-229. Judge Francis issued a Report and Recommendation on January 16, 2015, as amended on January 29, 2015, recommending an award to Movants of $8,720,181.85 plus prejudgment interest. Dkt.

4

Nos. 283 and 285. This Court adopted the Report and Recommendation by Opinion and Order on April 14, 2015. Dkt. No. 295.

As of the filing of the present motion, Travelers has not paid any of the past defense costs or interest awarded to CPTC by this Court's April 14, 2015 order, but Travelers provided a defense after the Court's Order of September 7, 2012.

## III.    Adjournment of Prior Dispositive Motions

On February 4, 2016, the parties filed cross motions for partial summary judgment on a number of issues, including allocation. Dkt. Nos. 327-372. In light of the Court's March 30, 2016 decision to permit Travelers to add Trygg-Hansa Insurance Company, Ltd. as a third-party defendant, Dkt. No. 429, the Court, on June 2, 2016, dismissed without prejudice all dispositive motions to permit additional discovery. Dkt. No. 443. The Court also directed the parties to brief the impact of the recently-decided *Viking Pump* decision in future dispositive motions. Dkt. No. 445 at 5:6-6:2.

## IV.    Current Procedural Posture

On December 20, 2017, the Court entered a Revised Civil Case Management Plan and Scheduling Order setting February 20, 2018 as the deadline for fact discovery and May 23, 2018 as the deadline for expert discovery. Dkt. No. 472 at ¶1 and ¶ 2. The Court also set June 22, 2018 as the deadline for dispositive motions. *Id.* at ¶ 3. Movants now seek partial summary judgment regarding allocation, Travelers' 1970-1973 primary policies, and missing Aetna coverage.

MEI 27202270v.9

## ARGUMENT

### POINT I

### AN "ALL SUMS" ALLOCATION GOVERNS CPTC'S INSURANCE POLICIES WITH NON-CUMULATION CLAUSES, WHILE A *PRO RATA* ALLOCATION APPLIES TO ALL REMAINING POLICIES

As stated, the Court held in September of 2012 that Travelers must fund all defense fees and costs as long as any of its unexhausted primary policies has been triggered. As a result, the Court still must rule on: (1) allocation of settlements and judgments to Travelers' and Aetna's triggered primary policies; and (2) allocation of defense fees and costs, settlements, and judgments to triggered umbrella and excess policies.

Although most states have adopted either *pro rata* or "all sums" methods for allocating long-tail claims triggering multiple policies, New York, since *Viking Pump*, employs both methods, depending on the language of each policy. Where some policies in a program contain non-cumulation clauses and others do not, the two approaches can co-exist in New York. Accordingly, as discussed below, the policies issued to CPTC containing non-cumulation clauses require application of the "all sums" method and the policies without such clauses are subject to *pro rata* allocation.

### A.   Allocation Under New York Law:  From *Pro Rata* to "All Sums"

The New York Court of Appeals has repeatedly made clear that the contract language controls the question of allocation. *E.g.*, *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257 (2016). In 2002, the Court of Appeals applied a *pro rata* allocation in a long-tail environmental coverage case, concluding that despite the policies' obligation to pay "all sums" for which the insured becomes liable, the policies before the court qualified that obligation by limiting the insurers' liability to damages or occurrences "during the policy period." *Consol. Edison Co. of N.Y. v.*

*Allstate Ins. Co.*, 98 N.Y.2d 208, 224 (2002). Because it is impossible to determine what portion of injury from a long-tail claim occurs during any particular policy period, courts developed the *pro rata* allocation, which is a "legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the 'during the policy period' limitation." *Viking Pump*, 27 N.Y.3d at 261. Following *Consolidated Edison*, New York courts consistently applied a *pro rata* allocation to long-tail claims until *Viking Pump* was decided in 2016.

In *Viking Pump*, the Court of Appeals held that, for policies containing non-cumulation clauses, an "all sums" or "joint and several" allocation applies, which allows an insured to "collect its total liability under any policy in effect during the periods that the damage occurred, up to the policy limits." *Id.* at 255, 264. The court did not overrule *Consolidated Edison*, but limited its application. *Viking Pump* acknowledged that *Consolidated Edison* turned exclusively on the interpretation of the explicit contractual obligation of a standard policy to pay "all sums" for injuries or occurrences "during the policy period," but did not address the impact of non-cumulation clauses as that issue was not before it. *Id.* at 258. *Viking Pump* explained that non-cumulation clauses "plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence" because they acknowledge that a given loss or occurrence may be "covered in whole or in part under any other excess [p]olicy issued to the [insured] prior to the inception date" of the policy. *Id.* at 261 (brackets in original). The effect of non-cumulation clauses on allocation is to "negate[] that premise [that the policy only pays for injuries that occur 'during the policy period'] by presupposing that two policies may be called upon to indemnify the insured for the same loss or occurrence." *Id.* at 261. Because the "during the policy period" qualifier does not limit the loss covered by the policy in the presence of a non-cumulation clause, those policies with non-cumulation clauses are contractually

7

obligated to pay "all sums" incurred by the insured, sweeping up into a single triggered policy period responsibility to pay all losses, whether occurring before, during or after the policy period. *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 151 (2d Cir. 2017).

The *Viking Pump* decision also concluded that policies with non-cumulation clauses are triggered by "vertical exhaustion." The insurers had argued that the umbrella and excess policies could only be triggered after all triggered primary policies (or lower level excess or umbrella policies) were exhausted. *Viking Pump*, 27 N.Y.3d at 264-65. The Court of Appeals rejected that argument, concluding that "vertical exhaustion is more consistent" with the policy language "tying attachment of the excess policies specifically to identified policies that span the same policy period." *Id.* at 265.

**B.**      ***Viking Pump* Applies to CPTC's Policies with Non-Cumulation Clauses**

Most of the umbrella and excess policies providing coverage to CPTC before 1986 contain non-cumulation clauses. *See* Appendix "A." Most of these non-cumulation clauses are essentially the same as one of the non-cumulation clauses analyzed in *Viking Pump* and address any loss covered under the policy that is "also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof." *E.g.*, Budesheim Dec., Ex. 3. Because this language matches the language relied on by the Court of Appeals in *Viking Pump*, *see* 27 N.Y.3d at 261, and because it "plainly contemplate[s] that multiple successive insurance policies can indemnify the insured for the same loss or occurrence," there cannot be any dispute that the "all sums" allocation applies to those umbrella and excess insurance policies containing non-cumulation clauses.

One Travelers primary policy also contains a non-cumulation clause. Travelers' primary policy No. T-SLG-138 T347-2-85, in effect from April 1, 1985 to April 1, 1986, states the following:

8

> In the event of an *injury, damage or loss covered by this policy and*
> *any other policy containing this provision* or a similar provision
> issued by the Company to the Named Insured, the maximum that
> will be paid under all such policies combined for such injury,
> damage or loss is the highest applicable limit of liability of any one
> of such policies.

Budesheim Dec., Ex. 4 (emphasis added).[4]  The italicized language above, although not identical

to the non-cumulation clauses quoted in *Viking Pump*, has the same effect:  the provision

"plainly contemplate[s] that multiple successive insurance policies can indemnify the insured for

the same loss or occurrence."  *Viking Pump*, 27 N.Y.3d at 260.   Nothing in *Viking Pump*

indicates that any particular wording is necessary to qualify as a non-cumulation clause or

implicate the "all sums" allocation; in fact, *Viking Pump* addressed two very differently worded

non-cumulation clauses, *see id.* at 252-53, but drew no distinction between the two.  The issue is

whether the language of the policy "presuppose[es] that two policies may be called upon to

indemnify the insured for the same loss or occurrence."  *Id.* at 261.  The wording of the Travelers

policy referenced above – "loss covered by this policy and any other policy containing this

provision" – presupposes that the loss will be covered by more than one policy and one policy

period, making this provision a non-cumulation clause and subjecting the policy to an all sums

allocation.

C.     **The Allocation Applicable to CPTC's Insurance Policies**

Movants do not dispute that the policies without non-cumulation clauses are subject to a

*pro rata* allocation under *Consolidated Edison*.  Accordingly, Movants do not dispute that the

primary policies (with the exception of the 1985-86 Travelers primary policy) are subject to a

*pro rata* allocation of settlements and judgments.  However, as this Court has already ruled,

under well-settled New York law, irrespective of *pro rata* allocation of settlements and

---

[4] Travelers' primary policies in effect from April 1, 1979 through April 1, 1985 contain the same
provision, but Travelers alleges those policies exhausted through non-asbestos claims.

judgments, the primary policies are responsible for 100% of defense costs, as long as one unexhausted primary policy is triggered for each claim. Dkt. No. 98; *Continental Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 655 (1993). Therefore, the unexhausted Travelers primary policies (including the Aetna primary policies to which Travelers is the successor in interest) are allocated 100% of defense costs and their *pro rata* share of indemnity.

Under *Viking Pump*, the umbrella and excess policies with non-cumulation clauses are responsible for the "total liability" of the insured if any damage occurred during their policy periods. *Viking Pump*, 27 N.Y3d at 255. Any umbrella or excess policy triggered by the asbestos claims against CPTC is fully responsible, under joint and several liability, for CPTC's entire loss, and CPTC can select any of the triggered policy periods with non-cumulation clauses to pay the entire loss. *Olin*, 864 F.3d at 151. As noted above, several of CPTC's umbrella policies are indisputably triggered by the asbestos claims because the primary policies from 1979 through 1985 were exhausted by non-asbestos claims. Moreover, the Second Circuit, applying *Viking Pump*, explicitly rejected the argument of the insurer that a *pro rata* allocation to the primary policies is necessary to determine whether the primary policies are exhausted. *Id.* at 145. The Second Circuit concluded that if the losses were sufficient to exhaust the primary policy in the year in which the insurer decided to spike its loss, the insured could apply all its losses to that year, exhausting the primary policy and allocating losses to the umbrella and excess policies with non-cumulation clauses. *Id.* Thus, it is clear that the policies with non-cumulation clauses are triggered by the asbestos and silica losses, and those policies can be called upon to pay the entirety of CPTC's asbestos losses.

Movants emphasize, however, that they do not seek a double recovery of any losses. Any amounts paid by the primary policies are not allocable to the triggered "all sums" umbrella

policies.   Rather, the losses actually paid by the primary policies would be deducted from the total loss allocable to the umbrella or excess policies with non-cumulation clauses.  *Id.* at 149-50.

In short, each of CTPC's insurance policies containing a non-cumulation clause is jointly and severally liable for all defense fees and costs, as well as the portion of settlements and judgments not paid by the primary policies.   Movants should have the option to select on a claim-by-claim basis the triggered policy with a non-cumulation clause from which to recover all losses  (less, of course, the amounts paid by the primary insurers).

**D.     The Court Should Order Supplemental Allocation Proceedings To Establish an Amount Certain Owed by the Insurers for Past Settlements**

Upon resolution of the pending partial summary judgment motions, the Court should order supplemental proceedings to permit the parties to calculate amounts owed to date by each insurer.   Once the parties have direction from the Court, they can engage in the largely mathematical exercise of allocating past settlements to the appropriate policies, along with prejudgment interest pursuant to N.Y. C.P.L.R. § 5004.    Movants propose that the Court establish an efficient process to determine the allocation of settlement amounts, similar to the procedure used by the Court with respect to defense fees and costs. Dkt. No. 189 at 14.

Danaher's risk management consultant, Dr. Greene, can conduct the mathematical exercise of allocating the asbestos and silica settlements on behalf of Movants. Dkt. No. 338, ¶ 17.  As set forth more fully in his Declaration, Dr. Greene has served as a consultant regarding CPTC's insurance program since 2008.  *Id.* at ¶ 10.   In that capacity, Dr. Greene gathers information and documentation regarding the asbestos and silica lawsuits, including claimant identities, defense expenditures, settlements and judgments, and periods of exposure.  *Id.* at ¶¶ 11-13.  He uses the information to prepare claims bordereaux that he shares with the insurers on a regular basis.  *Id.* at ¶¶ 14-16.  In addition to the allocation, Dr. Greene can calculate the

11

amount of prejudgment interest owed under New York law. *Id.* at ¶ 20. The insurers would then have an opportunity to review Dr. Greene's submission and assert any objections. Any disputes that could not be resolved would be submitted to the Court for a ruling.

Movants propose the following schedule for supplemental proceedings to establish allocation of past settlements:

- Movants provide their allocation of settlements and judgments to the insurers within thirty (30) days after the Court rules on the pending partial summary judgment motions;

- The insurers advise Movants within thirty (30) days thereafter of any objections to the proposed allocation; and

- The parties meet-and-confer within fourteen (14) days after the insurers submit their objections.

Movants also request that the Court set a date for a status conference after the meet-and-confer to update the Court on the parties' progress. If necessary, the Court then can establish a briefing schedule during the status conference through which the parties either can resolve or substantially narrow any remaining issues.

## POINT II

### TRAVELERS' POLICY NUMBERS TNSL 4892615, TNSL-951420-71, AND TNSL 951 420-72 CONTAIN NO AGGREGATE LIMIT APPLICABLE TO THE ASBESTOS AND SILICA LAWSUITS

Travelers' primary policies covering January 1, 1970 through January 1, 1973 plainly contain no aggregate limits of liability for bodily injuries, a fact that Travelers' corporate representative acknowledged during his deposition. Movants anticipate Travelers may argue external evidence creates an issue of fact regarding the existence of aggregate limits, but parol

evidence is inadmissible to create ambiguity in plain language.   Even if ambiguity somehow exists, the Court must construe it in Movants' favor.

## A.    The Policies Plainly Provide No Aggregate Limit

Interpretation of insurance policies presents "a question of law for the court." *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).  Insurance policies "must be interpreted according to common speech and consistent with the reasonable expectations of the average insured." *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011).  Unambiguous provisions are "given their plain and ordinary meaning." *Vigilant Ins. Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 177 (2008).

The plain language of Travelers policy numbers TNSL 4892615 (covering January 1, 1970 to December 31, 1971), TNSL-951420-71 (covering January 1, 1971 to December 31, 1972), and TNSL 951 420-72 (covering January 1, 1972 to December 31, 1973) reveals the absence of any aggregate limit of liability applicable to the underlying asbestos and silica lawsuits.   Budesheim Dec., Exs. 5-7.   The "Comprehensive General Liability Insurance Coverage Part" for each policy provides, in relevant part, "…the total liability of the company for all *damages* because of (1) all *bodily injury* included within the *completed operations hazard* and (2) all *bodily injury* included within the *products hazard* shall not exceed the limit of *bodily injury* stated in the declarations as 'aggregate.'"   Budesheim Dec., Ex. 5 at TRA 001857 (emphasis in original).   The "Proposal and Declarations" for each policy establishes the following limits for "Comprehensive General" coverage:

|  | each person | each occurrence | Aggregate |
|---|---|---|---|
| **Bodily Injury Liability** | 500 M | 1000 M |  |
| **Property Damage Liability** |  | 100 M | 100 M |

13

Budesheim Dec., Ex. 5 at TRA 001851, Ex. 6 at TRA 001927, and Ex. 7 at TRA 001997. Accordingly, no aggregate limit exists for "Bodily Injury Liability" under "Comprehensive General" coverage. *Id.* No other policy provisions or endorsements state an aggregate limit applicable to bodily injuries under the "Comprehensive General Liability Insurance Coverage Part." *See, e.g., U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 20 N.Y.3d 407, 416-17 (2013) (noting liability policies "contained 'per person' and 'per accident' limits," but no aggregate limit); *Cadet Mfg. Co. v. Am. Ins. Co.*, 391 F. Supp. 2d 884, 889-90 (W.D. Wash. 2005) (finding aggregate limit applied to product liability and personal liability claims, but not property damage claims).

**B.    Travelers' Corporate Designee Acknowledged the Policies Have No Aggregate Limit**

Travelers' corporate designee, Arthur Gilbert, admitted that policy numbers TNSL 4892615, TNSL-951420-71, and TNSL 951 420-72 contain no aggregate limit for bodily injury. Budesheim Dec., Ex. 8 at 106:8-112:10.   Mr. Gilbert testified that he could find no such aggregate:

> A. I see indication on the policy declarations, which is the top page, of an aggregate for property damage liability. I don't see one for bodily injury liability.

*Id.* at 109:19-22. After reviewing the policies in their entirety, Mr. Gilbert elaborated:

> A. What I see in the policy is only an aggregate for property damage. There doesn't seem to be an aggregate indicated on the policy for bodily injury.
>
> BY MR. OSIAS:
>
> Q.   And that's for all three policies; correct?
>
> A.   For all three policies, correct.

*Id.* at 111:2-8. In light of the unambiguous language of the policies and Mr. Gilbert's testimony, the Court should hold that the 1970-1973 primary policies do not have aggregate limits of liability applicable to bodily injury claims.

**C.     Travelers Cannot Avoid Summary Judgment by Citing External Evidence**

Based on past comments, Movants anticipate Travelers may argue a disputed issue of fact exists as to whether its 1970-1973 primary policies contain aggregate limits. Specifically, Travelers may contend ambiguity exists because Continental Casualty Company's ("Continental") Excess Liability Policy No. 893-54-20 and American Home Assurance Company's ("American Home") Umbrella Liability Policy No. BE 273 59 63, which are excess to Travelers' primary policies from April 7, 1972 through March 8, 1974, incorrectly reference an aggregate for bodily injury liabilities in Travelers' policies. Travelers cannot create ambiguity in its own policies through external evidence that does not reflect the intent of Travelers and CPTC. Finally, even if ambiguity did exist, the Court must construe it against Travelers.

**1.     Travelers Cannot Create Ambiguity Through Extrinsic Evidence**

The "parol evidence rule" precludes a party from introducing "extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing." *Investors Ins. Co. of Am. v. Dorinco Reins. Co.*, 917 F.2d 100, 104 (2d Cir. 1990). A party can admit parol evidence "to explain a writing only when the terms of the writing itself are ambiguous." *Id.* Correspondingly, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement [that] is complete and clear and unambiguous upon its face." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815-16 (2d Cir. 2014). Because Travelers' policies plainly provide no aggregate limits for bodily injury liabilities, Travelers cannot introduce Continental's and

ME1 27202270v.9

American Home's policies, which constitute extrinsic evidence, to vary the terms of Travelers' policies.

**2.     Continental's and American Home's Policies, in Any Event, Do Not Aid in Interpreting Travelers' Policies**

Even if Travelers could introduce extrinsic evidence, Continental's and American Home's policies do not reveal Travelers' and CPTC's intent.   Continental's and American Home's policies represent agreements between CPTC, Continental, and American Home.  Dkt. No. 332-1; Dkt. No. 332-4.  Travelers has never been a party to either Continental's or American Home's policy and had no part in drafting them.   *Id.*   Continental's and American Home's policies, therefore, do not reflect the intent of Travelers and CPTC with respect to aggregate limits in Travelers' policies.

**3.     Even if Ambiguity Exists, the Court Must Construe It in Favor of Coverage**

Courts in New York determine as a matter of law "whether an insurance policy is ambiguous." *In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir. 1998).  Ambiguity exists only when a policy provision "is reasonably susceptible to more than one reading." *Id.*  To the extent ambiguity exists, courts construe it in favor of coverage and against the insurer as the scrivener of the policy. *Metro. Prop. & Cas. Ins. Co. v. Mancuso*, 93 N.Y.2d 487, 497 (1999).  Thus, even if the Court somehow were to find ambiguity in the Travelers policies, it must interpret it in favor of coverage.

## POINT III

### SECONDARY EVIDENCE ESTABLISHES THE EXISTENCE, TERMS, AND CONDITIONS OF MISSING PRIMARY COVERAGE ISSUED BY AETNA

Travelers disputes that Aetna sold primary policies to CPTC prior to January 1, 1961 and for the period from January 1, 1962 to January 1, 1963.  Under New York law, Movants may

16

prove the existence of missing policies through secondary evidence. As set forth below, documentary evidence and testimony establish Aetna sold primary coverage between December 31, 1946 and January 1, 1961, as well as from January 1, 1962 through January 1, 1963. Travelers, moreover, produced policy forms establishing the terms and conditions of the missing policies.

## A.    Movants May Prove the Lost Policies Through Secondary Evidence

Where a policyholder has made a "diligent but unsuccessful search and inquiry" for a missing policy, it "may rely on secondary evidence (*i.e.*, evidence other than the policy itself) to prove the [policy's] existence and terms[.]" *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). The policyholder has the burden to prove the existence and terms by a preponderance of the evidence because a higher standard "would only serve to encourage carriers to destroy policies as soon as possible in the hope that those who had paid for insurance would be unable to produce the policies after the lapse of a substantial period." *Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 661 N.Y.S.2d 948, 951 (N.Y. Cty. 1997); *Glew v. Cigna Grp. Ins.*, 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008); *Emerson Enter., LLC v. Crosby*, No. 03-CV-6530 CJS, 2007 WL 4118299, *7 (W.D.N.Y. Nov, 14, 2007). The policyholder can satisfy the burden "by any kind of secondary evidence." *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986).

In *Burt Rigid Box,* for example, the Second Circuit affirmed summary judgment for the policyholder concerning the existence and terms of missing insurance policies issued by Aetna. 302 F.3d at 93. The court reached its conclusion based on secondary evidence, including: business records from Aetna demonstrating policy numbers and periods, oral testimony from an Aetna representative, oral testimony from the policyholder's employee indicating that the

company had insured all of its subsidiaries, and an excess policy listing Aetna in the schedule of underlying insurance. *Id.* at 92-93.

**B.      Movants Diligently Searched for the Missing Policies**

Movants diligently searched for the missing Aetna policies, but the search was unsuccessful.   Dr. Timothy Greene, Danaher's risk management consultant, testified that Danaher requested from CPTC copies of all liability policies for periods prior to 1987.  CPTC, however, could not find the missing Aetna policies.  Budesheim Dec., Ex. 9 at 24:3-25:17. Danaher reviewed the files of DLA Piper, including a 1989 review of all of CPTC's historical insurance records.  *Id.* at 13:25-15:2.  Danaher reviewed files from Skadden, Arps, Slate, Meagher & Flom LLP, which had previously served as counsel to CPTC, and in that capacity, had searched through files in Danaher's risk management department.  *Id.* at 15:3-3.  Danaher also made a request to the New York Department of Insurance, which found no records.  *Id.* at 94:20-95:12.

Movants sought copies of the missing policies directly from Travelers during discovery. Travelers' corporate designee, Julio C. Velez, testified that a search for the Aetna policies had been performed in 1996 and again immediately before and after this case commenced. Budesheim Dec., Ex. 10 at 11:23-12:6.  Travelers, however, did not locate additional policies, although it did produce secondary evidence of coverage.  *Id.* at 36:11-37:2; 43:4-9.  Movants, therefore, have exhausted every potential avenue in an attempt to locate the Aetna policies.

**C.      Secondary Evidence Proves the Missing Aetna Coverage**

As set forth below, documentary evidence identifies policies commencing on December 31, 1946. CPTC's former Treasurer, moreover, testified that CPTC purchased primary coverage continuously from Aetna beginning in the late 1930s, although no documentary evidence for the years predating 1946 has been located.  Budesheim Dec., Ex. 11 at 25:9-13.  Movants do have

18

secondary evidence confirming that Aetna sold continuous primary coverage beginning on December 31, 1946.

     **1.**     **Documentary Evidence and Oral Testimony Prove Aetna's Coverage Between December 31, 1946 and January 1, 1954**

Travelers produced in discovery a list of policies issued by Aetna to CPTC between December 31, 1946 and January 1, 1954. Budesheim Dec., Ex. 12 at TRA_SUPP_00017-TRA_SUPP_00018. The list identifies the following policies:

- No. 1 LC 4190 for the period from December 31, 1946 through December 31, 1949;

- No. 1 LC 8124 for the period from December 31, 1949 through January 1, 1953; and

- No. 1 LC 13310 for the period from January 1, 1953 through January 1, 1954.

*Id.* During his deposition, Mr. Gilbert testified that the document "appears to be a listing of policy numbers." Budesheim Dec., Ex. 8 at 34:9-10. Describing the first entry on the list, he testified:

> Going across, it appears to have a named insured, policy number 1 LC 4190, those are the components of the policy that I explained further. The next three, 12-31-46 would be an effective date, and the next three, 12-31-49 would be an expiration date.

*Id.* at 34:10-15. He testified that "LC" referred to the "policy form" used for the policy. *Id.* at 35:3-8. Travelers produced the "LC" form used by Aetna. Budesheim Dec., Ex. 13.

Travelers also produced numerous "Binding Advices," which Mr. Gilbert described as reinsurance cover notes confirming "reinsurance was placed on a policy insuring Chicago Pneumatic." Budesheim Dec., Ex. 14; Ex. 8 at 37:20-40:15. The cover notes reflect "Product Bodily Injury Liability" insurance sold to CPTC from December 31, 1946 through December 31, 1949 and from December 31, 1949 through January 1, 1953 containing "Product Bodily Injury" limits of $100,000 per person and $300,000 in the aggregate. Budesheim Dec., Ex. 14 at

TRA_SUPP_00019 and TRA_SUPP_00026. Likewise, the cover notes describe insurance for "bodily injury liability" incepting on January 1, 1953 with the same limits. *Id.* at TRA_SUPP_00025. Thus, documentary evidence produced by Travelers, as well as Mr. Gilbert's testimony, proves Aetna sold primary products liability coverage to CPTC between December 31, 1946 and January 1, 1954 with annual limits of $100,000 per person and $300,000 in the aggregate.

Correspondence from Thomas H. Canty, Inc. ("Canty"), an insurance agent, corroborates that Aetna sold coverage to CPTC in the late 1940s. Canty wrote to CPTC on December 1, 1947 seeking documentation because "The Aetna are in the course of preparing your renewal policies." Budesheim Dec., Ex. 15. Later that month, Canty returned certain documents to CTPC that had been "loaned to us for the Aetna Casualty & Surety Company." Budesheim Dec., Ex. 16.

### 2. Documentary Evidence Proves Aetna Sold Coverage after January 1, 1956

Additional documentary evidence establishes Aetna sold coverage to CPTC between 1956 and 1960 and from 1962 to 1963. Travelers produced a "Loss Record" listing claims filed under policies issued to "Chicago Pneumatic Tool Co. et/al." Budesheim Dec., Ex. 17. The document identifies policy number "1 JC 4536" for the period "1-1-56/59," number "1 AL 10266" for the period "1-1-59/62," and number "1 AL 21764" for the period "1-1-62/65." *Id.*

Similarly, a May 25, 1989 notice of claims to Aetna from CPTC's Treasurer listed the Aetna policies known to CPTC at the time. Budesheim Dec., Ex. 18. The letter states, in relevant part:

> The company's records indicate that Aetna was the primary insurance carrier for CPT back to the early 1930s. The following specific policy numbers have been identified:

| Period | Policy # |
|---|---|
| 1/1/56-1/1/57 | 1 JC-4534 |
| 1/1/60-1/1/61 | 72 AL748L and 72 AL748 HR |
| 1/1/61-1/1/62 | 72 AL 2617 |
| 1/1/63-1/1/64 | 72 AL 5098 |
| 1/1/64-1/1/65 | 72 AL 6640 |
| 1/1/65-1/1/66 | 72 AL 010188 |
| 1/1/66-1/1/67 | 72 AL 013215 |
| 1/1/67-1/1/68 | 72 AL 136029 |
| 1/1/68-1/1/69 | 72 AL 138989 |
| 1/1/69-1/1/70 | AL 142283 |

*Id.* Thus, CPTC's records confirm that CPTC purchased continuous coverage from Aetna between 1956 and 1970. Travelers produced the AL form used by Aenta. Budesheim Dec., Ex. 13.

### 3. Oral Testimony by CPTC's Former Treasurer Proves Aetna Sold Primary Coverage to CPTC Each Year Between 1942 and 1966

Documentary and oral testimony by Travelers' designee, as stated, establishes that Aetna sold coverage to CPTC between December 31, 1946 and January 1, 1954, January 1956 and January 1, 1961, and in 1962. Testimony by Albert Stern supports the conclusion that Aetna also sold coverage from 1954 through 1955.[5] Mr. Stern served as CPTC's Assistant Treasurer beginning on January 1, 1942, became Treasurer in June of 1952, and left the company on April 30, 1966. Budesheim Dec., Ex. 11 at 19:17-20:2, 24:1-3, and 25:17-19. Mr. Stern's responsibilities included procuring "proper and adequate insurance coverage." *Id.* at 21:3-8.

Mr. Stern testified that Aetna issued products liability insurance to CPTC every year during his tenure:

> Q. You mentioned the products coverage with Aetna. Do you remember whether Chicago Pneumatic purchased products liability

---

[5] CPTC deposed Mr. Stern in 1990 in an effort to preserve his testimony regarding insurance coverage issued to CPTC prior to 1966. Counsel for both Travelers and Aetna attended the deposition. Mr. Stern is now deceased.

ME1 27202270v.9

> insurance every year that you were with the company or only for
> certain years?
>
> A. Every year.  However, I do not recall correctly if there were
> some one-year policies, but then we went into longer term, for two
> or three-year policies so we wouldn't have to go through the same
> thing year after year.

*Id.* at 25:9-16.  Mr. Stern expressed confidence that Aetna sold coverage each year because CPTC always purchased product liability and other forms of coverage from Aetna and because he discussed each renewal with CPTC's insurance broker.  *Id.* at 25:20-27:9.  Mr. Stern's testimony, therefore, supports the conclusion that Aetna sold primary coverage to CPTC for each missing policy year, including from 1954 through 1955, from 1957 through 1959, and in 1962.

### 4.    Mr. Stern's Testimony Establishes the Limits of Aetna's Policies

Mr. Stern also testified regarding the limits of liability in Aetna's policies.  Specifically, Mr. Stern stated that the coverage sold by Aetna contains limits of $100,000 per accident. Budesheim Dec., Ex. 11 at 34:9-12.  Mr. Stern's recollection comports with the "Binding Advices" produced by Travelers, which set forth a per-person limit of $100,000, $300,000 in the aggregate, for coverage sold between December 31, 1946 and January 1, 1954, *supra* at 19-20, and with the correspondence, loss runs and policy list described above.  Mr. Stern also testified that, beginning at a date during his tenure as Treasurer that he could not recall,  Aetna's policies had aggregate limits of $1 million. Budesheim Dec., Ex. 11 at 34:9-12.

Based on the aggregate of evidence, the Court should rule that Aetna sold continuous coverage to CPTC in each year from December 31, 1946 to January 1, 1966, with limits of $100,000 per person/$300,000 in the aggregate. *See L. Lewitt & Co. v. Jewelers' Safety Fund Soc.,* 249 N.Y. 217, 222 (N.Y. 1928) (stating "a policy which renews an old policy must renew the terms of that policy as they stood at the moment of its expiration"); *Estee Lauder Inc. v. OneBeacon Ins. Grp., LLC,* 873 N.Y.S.2d 592, 598 (N.Y. App. Div. 2009) (adopting

22

presumption in missing policy case that "that the terms of the renewal policy are identical to the terms of the policy being renewed"); *Ne. Utils. v. Century Indem. Co.*, Nos. X03CV 990495495S, X03CV 980495496S, 1999 WL 476274, *4 (Conn. Super. Ct. June 21, 1999) (collecting cases nationwide holding that renewal policies contain terms identical to the prior policy).

Because Mr. Stern could not recall when Aetna's policies began to include the $1 million aggregate limit, the Court reasonably can infer that, at least Aetna's January 1, 1966 through January 1, 1967 policy, which was the last policy procured while Mr. Stern worked for CPTC, contained a $1 million aggregate limit. Reason dictates that, while the first Aetna policy with a $1 million aggregate limit remains unclear, at least the last policy Mr. Stern procured must have had that limit. It is likewise reasonable for the Court to infer that the Aetna policies from January 1, 1967 to January 1, 1970 continued a $1 million aggregate limit, which is the per-occurrence limit in the first Travelers policy, issued on January 1, 1970. (As explained above, the 1970 Travelers policy has no aggregate limit.)

**D.     Policy Forms Produced by Travelers Establish the Terms of the Missing Policies**

Policy forms produced by Travelers include the terms of the missing Aetna policies. Travelers produced Aetna forms for policies issued with an "LC" designation, such as those issued to CPTC in the 1940s and 1950s, as well as a form for policies with an "AL" designation, for the policies incepting in 1960, including 1962. Budesheim Dec., Ex. 13. The forms provide coverage for "bodily injury liability":

> To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

23

*Id.* at TRA_SUPP_00181, TRA_SUPP_00185, and TRA_SUPP_00189.   The lawsuits filed against CPTC, which allege bodily injuries resulting from exposure to asbestos and silica, fall within the coverage grant in those forms.

Mr. Gilbert admitted that, while the forms do not necessarily establish all terms and conditions of the policies, the forms themselves contain no exclusions for asbestos or silica liabilities.   Budesheim Dec., Ex. 8 at 76:15-23.   To the extent Travelers contends any exclusionary provisions may apply, Travelers has the burden to prove their existence and application.   *Burroughs*, 632 F. Supp. at 1223.   Travelers has presented no evidence to date suggesting any exclusions applicable to the asbestos and silica lawsuits during the period in question (nor would any such exclusions be expected in those early years).[6]

## CONCLUSION

For the reasons set forth above, the Court should:

(1)   find that an "all sums" allocation applies to defense fees and costs, as well as settlements and judgments, payable under the umbrella and excess policies with non-cumulation clauses set forth on Appendix "A";

(2)   find that an "all sums" allocation applies to settlements and judgments payable under Travelers' primary policy number T-SLG-138 T347-2-85 covering April 1, 1985 through April 1, 1986;

(3)   schedule supplemental proceedings to establish the amount of past asbestos and silica settlement amounts allocable to CPTC's primary, umbrella, and excess policies;

---

[6] The earliest asbestos exclusions Movants could locate in the case law reference exclusions being added to policies in 1978 – more than 15 years after the policies disputed by Travelers. *Carey-Canada, Inc. v. Cal. Union Ins. Co.*, No. 83-1106, 1984 U.S. Dist. LEXIS 17510, at *3 (D.D.C. Apr. 17, 1984).

ME1 27202270v.9

(4) rule that Travelers' policy numbers TNSL 4892615, TNSL-951420-71, and TNSL 951 420-72 contain no aggregate limits of liability applicable to CPTC's asbestos and silica lawsuits;

(5) rule that Travelers' predecessor in interest, Aetna, issued primary coverage to CPTC in each year from December 31, 1946 to January 1, 1966 with an aggregate limit of $300,000; and

(6) rule that Aetna issued coverage to CPTC in each year from January 1, 1966 to December 31, 1969 with an aggregate limit of $1 million.

By: *s/ Adam J. Budesheim*
 Gita F. Rothschild (GR7636)
 Adam J. Budesheim (AB4010)
 McCarter & English, LLP
 Worldwide Plaza
 825 Eighth Ave., 31st Floor
 New York, NY 10019
 Phone: 212.609.6800
 Fax: 212.609.6921
 *Attorneys for Plaintiff*
 *Danaher Corporation*

By: *s/ Paul E. Breene*
 Paul E. Breene (PB7989)
 Reed Smith LLP
 599 Lexington Avenue
 22nd Floor
 New York, NY 10022
 Phone: 212.521.5400
 Fax: 212.521.5450
 *Attorneys for Third-Party Defendant*
 *Atlas Copco North America LLC*

DATED: June 22, 2018

ME1 27202270v.9