UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANAHER CORPORATION,

                                    Plaintiff,

                -v-

THE TRAVELERS INDEMNITY COMPANY,
et al.,

                                    Defendants.

THE TRAVELERS INDEMNITY COMPANY
and TRAVELERS CASUALTY AND SURETY
COMPANY,

                                    Third-Party Plaintiffs,

                -v-

ATLAS COPCO NORTH AMERICA, INC.
(as successor to CHICAGO PNEUMATIC
TOOL COMPANY), et al.,

                                    Third-Party Defendants.

10-CV-121 (JPO)

OPINION AND ORDER
(REDACTED)

J. PAUL OETKEN, District Judge:

        This action was initiated by Plaintiff Danaher Corporation ("Danaher") to resolve

disputes concerning insurance coverage for silica- and asbestos-related claims brought against

one of Danaher's former subsidiaries, Chicago Pneumatic Tool Company ("Chicago

Pneumatic").  Danaher brings state-law contract and declaratory judgment claims against

Defendants the Travelers Indemnity Company and the Travelers Casualty and Surety Company

(together, "Travelers").  (Dkt. No. 22 ¶¶ 3–5, 34–48.)  Danaher's claims against Travelers stem

from Travelers' alleged refusal to comply with the terms of a number of primary and excess

insurance policies that Travelers had issued to Chicago Pneumatic in the years prior to Danaher's

1987 sale of Chicago Pneumatic to Third-Party Defendant Atlas Copco North America, Inc.

("Atlas Copco") (Dkt. No. 22 ¶¶ 16, 20, 33; *see also* Dkt. No. 619 ¶ 1; Dkt. No. 564-2).  Danaher

also brings breach of contract and declaratory judgment claims against one of Chicago

Pneumatic's excess insurers from this period, Defendant North River Insurance Company

("NR").  (Dkt. No. 22 ¶¶ 6, 21, 34–43; Dkt. No. 604 ¶ 1; *see also* Dkt. Nos. 578-1, 578-2.)

Finally, Danaher seeks a declaratory judgment adjudicating the obligations of nine other of

Chicago Pneumatic's excess insurers from the period prior to Danaher's sale of Chicago

Pneumatic to Atlas Copco (together with NR, the "Excess Insurers").  (Dkt. No. 22 ¶¶ 34–40.)[1]

In addition to answering Danaher's allegations and asserting counterclaims and

crossclaims against all parties in this action (*see* Dkt. No. 13), Travelers has impleaded as Third-

Party Defendants in this action Atlas Copco, the current owner of Chicago Pneumatic, as well as

the issuers of various of Atlas Copco's primary and excess liability insurance policies in the

years following Atlas Copco's acquisition of Chicago Pneumatic (collectively, the "Post-

Acquisition Insurers")[2] (Dkt. No. 455).  Travelers seeks a declaratory judgment adjudicating the

---

[1] The Excess Insurers other than NR are: (1) the American Home Assurance Company ("American Home"); (2) Unigard Mutual Insurance Company ("Unigard"); (3) Employers Insurance Company of Wausau ("Wausau"); (4) Continental Casualty Company ("Continental Casualty"); (5) Employers Commercial Union Insurance Company ("OneBeacon"); (6) International Insurance Company ("TIG"); (7) Granite State Insurance Company ("Granite State"); (8) National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union"); and (9) Allianz Underwriters Insurance Company ("Allianz").  (Dkt. No. 22 ¶¶ 7–15.)  Among the Excess Insurers, only American Home has not filed a summary judgment motion seeking the dismissal of all claims against it.

[2] The Post-Acquisition Insurers, *i.e.*, Atlas Copco's insurers that have been impleaded by Travelers as Third-Party Defendants in this action, are: (1) Century Indemnity Company ("Century"); (2) Liberty Mutual Fire Insurance Company ("Liberty Mutual"); (3) Trygg-Hansa Insurance Company, Ltd. ("Trygg-Hansa"); (4) Industria Insurance Company Ltd. ("Industria"); and (5) Zurich Insurance plc ("Zurich").  (Dkt. No. 455 ¶¶ 14–17.)  Although Zurich Insurance Company was initially impleaded as an additional Third-Party Defendant (*see* Dkt. No. 455

scope of its obligations to Atlas Copco with respect to indemnifying and defending against the underlying asbestos and silica claims brought against Chicago Pneumatic. (Dkt. No. 455 ¶¶ 40–49.) In addition, Travelers seeks an allocation as between itself and the Third-Party Defendants of the costs of defending the underlying claims, as well as an order mandating that the Third-Party Defendants pay contribution to Travelers for any indemnification payments Travelers might make on behalf of Chicago Pneumatic. (Dkt. No. 455 ¶¶ 50–62.)

Before the Court now are the parties' cross-motions for summary judgment. (*See* Dkt. Nos. 483–656.) Specifically, the following motions are now pending before the Court: Plaintiff Danaher and Third-Party Defendant Atlas Copco's motion for partial summary judgment (Dkt. No. 519); Defendant and Third-Party Plaintiff Travelers' motion for partial summary judgment (Dkt. No. 510); the Excess Insurers' motions for summary judgment (Dkt. Nos. 483, 488, 492, 496, 498, 503, 515, 520, 531); and the Post-Acquisition Insurers' motions for summary judgment (Dkt. Nos. 504, 517, 529, 551). For the reasons that follow, Danaher and Atlas Copco's motion is granted in part and denied in part, Travelers' motion is granted in part and denied in part, the Excess Insurers' motions are denied, and the Post-Acquisition Insurers' motions are granted.

I. **Background**

Familiarity with this case's long history is presumed based on this Court's prior opinions in this action. *See, e.g.*, *Danaher Corp. v. Travelers Indem. Co.*, No. 10 Civ. 121, 2013 WL 150027 (S.D.N.Y. Jan. 10, 2013) (Francis, Mag. J.); *Danaher Corp. v. Travelers Indem. Co.*, No. 10 Civ. 121, 2014 WL 1133472 (S.D.N.Y. Mar. 21, 2014); *Danaher Corp. v. Travelers Indem. Co.*, No. 10 Civ. 121, 2014 WL 7008938 (S.D.N.Y. Dec. 12, 2014); *Danaher Corp. v. Travelers*

---

¶ 16), it has since been voluntarily dismissed by stipulation (Dkt. No. 464). Among the remaining Post-Acquisition Insurers, only Industria has not filed a motion for summary judgment.

*Indem. Co.*, No. 10 Civ. 121, 2016 WL 1255739 (S.D.N.Y. Mar. 30, 2016). The Court provides below a summary of the facts and procedural history most relevant to the resolution of the present motions. The following facts are drawn primarily from the parties' Local Rule 56.1 statements and attached exhibits and, unless otherwise noted, are not subject to genuine dispute.

Chicago Pneumatic was the manufacturer of various products that have been and continue to be the subject of asbestos-related bodily injury claims (the "Asbestos Claims") and silica-related bodily injury claims (the "Silica Claims," and together with the Asbestos Claims, the "Underlying Claims"). (Dkt. No. 607 ¶ 1.) As of the briefing of these motions, Danaher and Atlas Copco, on behalf of Chicago Pneumatic, had incurred more than $8.7 million in fees and costs defending the Underlying Claims,[3] and more than $2 million in settling those claims. (Dkt. No. 607 ¶ 57; Dkt. No. 619 ¶ 5; Dkt. No. 612 ¶¶ 11, 13, 15.) In addition, Travelers has incurred over $7.1 million in costs and fees in the defense of the Underlying Claims, and Travelers continues to incur defense costs defending live claims. (Dkt. No. 607 ¶ 56; Dkt. No. 565 ¶¶ 10–11.) No new Silica Claims have been filed against Chicago Pneumatic since 2006. (Dkt. No. 612 ¶ 14; *see also* Dkt. Nos. 485-9 at 1–2, 485-10 at 12–13, 485-11 at 12–13 (demonstrating stagnation in number of Silica Claims against Chicago Pneumatic).) However, new Asbestos Claims continue to be filed against Chicago Pneumatic, and current trends indicate that new Asbestos Claims may well be filed at a similar rate for the foreseeable future. (Dkt. Nos. 485-9

---

[3] The amount of costs and fees incurred by Chicago Pneumatic in defending against the Underlying Claims was previously the subject of dispute among Travelers and Danaher and Atlas Copco, but upon a review of the relevant billing records, this Court affirmed that the approximately $8.7 million figure cited above represented Chicago Pneumatic's reasonably incurred "fees and costs arising from [defending against] the [U]nderlying [C]laims." *Danaher Corp. v. Travelers Indem. Co.*, No. 10 Civ. 121, 2015 WL 1647435, at *7 (S.D.N.Y. Apr. 14, 2015).

at 3–9, 485-10 at 2–11, 485-11 at 2–11, 485-12; Dkt. No. 484 at 12 (noting that an average of 70 new Asbestos Claims per year have been filed in each of the last three years); Dkt. No. 611 ¶ 6.)

Danaher acquired Chicago Pneumatic in 1986.  (Dkt. No. 607 ¶ 5.)  On April 22, 1987, Danaher sold Chicago Pneumatic to Atlas Copco pursuant to a Stock Purchase Agreement ("SPA"), and Danaher no longer maintains any ownership interest in Chicago Pneumatic.  (Dkt. No. 607 ¶¶ 6–7; *see also* Dkt. No. 564-2.)  Section 11(a) of the SPA, the "Indemnification Clause," provides that:

> [Danaher] shall defend, indemnify and hold harmless, [Atlas Copco], its successors, assigns and affiliates against and in respect of: . . .
>
> (iv) any and all losses, damages, deficiencies or liabilities in excess of applicable reserves of [Chicago Pneumatic] . . . resulting from any claims against [Chicago Pneumatic] or any Subsidiary arising in connection with death, personal injury, other injury to persons, property damage, losses or deprivation of rights (whether based on statute, negligence, breach of warranty, strict liability or any other theory) caused by or resulting from, directly or indirectly, any defect or claimed defect in or with respect to any products manufactured or services performed for customers on or before the Closing Date with respect to the businesses of [Chicago Pneumatic] or any of its Subsidiaries or any violation of applicable law or regulation before the Closing Date, provided, however, that any such amount will be net of any amounts received pursuant to Section 11(h) hereof. . . .

(Dkt. No. 564-2 at 11, 13 (emphasis omitted).)  Section 11(h) of the SPA provides that:

> [Atlas Copco] will cause [Chicago Pneumatic] to indemnify and hold [Danaher] harmless from and against all damages covered by the insurance policies owned by the [Chicago Pneumatic] Group prior to the Closing Date, arising from the business and operations of the [Chicago Pneumatic] Group and [Danaher] and its affiliates prior to the Closing Date but only to the extent of any amounts received, after the Closing Date, pursuant to and in accordance with the terms of, the insurance policies covering such damages.

(Dkt. No. 564-2 at 24.)  In the years following Danaher's sale of Chicago Pneumatic to Atlas Copco, Danaher tried unsuccessfully to enlist the aid of Chicago Pneumatic's pre-acquisition insurers in the defense and indemnification of losses stemming from the Underlying Claims, and Danaher initiated this action in order to compel Travelers and the Excess Insurers to fulfill their

alleged obligations under the insurance policies they had issued to Chicago Pneumatic prior to its acquisition by Atlas Copco. (*See* Dkt. No. 22 ¶¶ 20–22, 31, 33; *see also* Dkt. No. 575-6 at 18.)

Danaher is now suing two categories of Chicago Pneumatic's pre-acquisition insurers: (1) Chicago Pneumatic's primary insurer from this period; and (2) Chicago Pneumatic's excess insurers from this period.[4] The sole member of the first group is Travelers, which Danaher alleges issued primary insurance policies to Chicago Pneumatic from 1936 through 1987. (Dkt. No. 22 ¶ 20.) Travelers does not dispute, for purposes of these motions, that it did in fact issue or is responsible for providing coverage pursuant to primary insurance policies issued to Chicago Pneumatic for the calendar year 1961 and for the period between January 1, 1963 and April 1, 1986. (Dkt. No. 607 ¶¶ 14–15; Dkt. No. 619 ¶¶ 1–2; *see also, e.g.*, Dkt. Nos. 527-4 to 527-7 (excerpting selected Travelers policies from the 1970 to 1986 period).) However, the parties disagree with respect to whether and to what extent Travelers is responsible for indemnifying or defending Chicago Pneumatic under any primary insurance policies for the calendar years 1946 through 1960, as well as the calendar year 1962; the parties also disagree about the meaning of certain terms and the scope of coverage provided under the other primary policies issued by Travelers and its predecessor to Chicago Pneumatic. (*See, e.g.*, Dkt. No. 607 ¶¶ 13–15, Dkt. No. 619 ¶¶ 7–9, 19; *see also* Dkt. No. 618 at 16–25; Dkt. No. 648 at 4–10.)

---

[4] "In this context, 'primary' insurance refers to the first layer of insurance coverage that attaches immediately upon the occurrence of a policy-defined liability or loss. 'Excess liability policies, by contrast, . . . provide an additional layer of coverage for losses that exceed the limits of a primary liability policy. Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted.'" *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 (2d Cir. 2013) (omission in original) (citation omitted) (quoting *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008)); *see also Olin Corp. v. Am. Home Assurance Co.,* 704 F.3d 89, 93 & n.6 (2d Cir. 2012) (describing how excess liability policies operate).

At least some of the Travelers primary policies issued to Chicago Pneumatic —

specifically those covering the policy periods of April 1, 1979 to April 1, 1985 — were fully

exhausted by the time of the briefing of these motions.  (Dkt. No. 565 ¶ 8; Dkt. No. 607 ¶ 16.)  A

number of the other Travelers policies were at that time substantially impaired; however, each

impaired policy retained coverage limits in excess of at least a quarter-million dollars.  (Dkt. No.

624 ¶¶ 4–6; *see also* Dkt. No. 485-7 (January 7, 2009 letter providing year-by-year assessment of

remaining limits on Travelers' policies spanning January 1, 1973 through April 1, 1987 as of that

date).)

The second category of Chicago Pneumatic's pre-1987 insurers sued by Danaher in this

action are the Excess Insurers, the issuers of excess insurance policies to Chicago Pneumatic

prior to Danaher's sale of Chicago Pneumatic to Atlas Copco.  (Dkt. No. 22 ¶¶ 6–15, 21–22; *see

also* Dkt. No. 622 at 5–13 (surveying Chicago Pneumatic's excess insurance policies from the

years 1972 to 1986).)  Among the Excess Insurers' policies, the NR policy that sits directly

above the exhausted 1979 to 1982 Travelers policies has already been eroded.  (*See* Dkt. No. 574

¶ 19; *see also*, *e.g.*, Dkt. No. 564-8 (evidencing NR's 1979 to 1982 excess policy issued to

Chicago Pneumatic).)  NR's policies contain what is known as a non-cumulation provision,

which provides that:

> It is agreed that if any loss covered hereunder is also covered in whole or in part
> under any other excess policy issued to the Insured prior to the inception date
> hereof the limit of liability hereon . . . shall be reduced by any amounts due to the
> Insured on account of such loss under such prior insurance.

(Dkt. No. 527-3 at 3.)  Many of the Excess Insurers' policies contain provisions comparable to

the non-cumulation provision found in NR's policies.  (*See*, *e.g.*, Dkt. No. 485-4 at 5 (American

Home's 1972 to 1975 policy's non-cumulation provision); 494-2 at 12 (Allianz's 1985 to 1986

policy's non-cumulation provision); Dkt. No. 523-1 at 4 (Unigard's 1974 to 1977 policy's non-

cumulation provision); *see also generally* Dkt. No. 522-1 (surveying the non-cumulation provisions in each of the Excess Insurers' policies).)

Relatively early on in this case's long life, Danaher and Atlas Copco moved for summary judgment on the issue of Travelers' duty to defend the Underlying Claims against Chicago Pneumatic. (Dkt. No. 53.) On September 6, 2012, this Court held that Travelers had a duty to defend the Underlying Claims and that Travelers was responsible for reimbursing Danaher and Atlas Copco for the defense costs they had incurred to that point in defending the Underlying Claims. (Dkt. No. 575-6 at 57–61; *see also* Dkt. No. 98.) The Court did not then decide whether and to what extent Chicago Pneumatic's other insurers could be held liable for contribution for Travelers' defense costs, leaving that question "for another day." (Dkt. No. 575-6 at 59.) In accordance with the Court's September 6, 2012 order, Travelers has been incurring and continues to incur defense costs in connection with the Underlying Claims. (Dkt. No. 607 ¶ 55.)

Travelers, in addition to answering Danaher's allegations and asserting counterclaims and crossclaims against all parties named by Danaher in this action (*see* Dkt. No. 13), has at different times impleaded or sought to implead numerous additional parties as third-party defendants in this action (*see, e.g.*, Dkt. Nos. 123, 192, 430). Travelers' attempts to do so have been the subject of frequent dispute and numerous decisions by this Court. (*See, e.g.*, Dkt. Nos. 121, 189, 278, 429.) Travelers' currently operative Third-Party Complaint impleads Third-Party Defendants Atlas Copco, the current owner of Chicago Pneumatic, and the Post-Acquisition Insurers, the issuers of various primary and excess liability insurance policies to Atlas Copco in the years following Atlas Copco's acquisition of Chicago Pneumatic. (Dkt. No. 455.)

When, in March 2016, the Court granted Travelers leave to reassert its claims against Post-Acquisition Insurer Trygg-Hansa (Dkt. No. 429), discovery had already closed with respect

to this action's other claims, and a number of parties had filed motions for summary judgment (*see* Dkt. Nos. 327, 329, 331, 341–42, 345, 360, 362–63, 375).  In order to align the discovery schedules for all claims in this action, as well as to allow the parties to address intervening developments in the case law, the Court denied the parties' then-pending motions for summary judgment without prejudice to renewal of the arguments therein following the conclusion of discovery with respect to all claims in this action.  (Dkt. No. 443; Dkt. No. 445 at 5–9.)

Discovery has now closed (*see* Dkt. No. 472), and the following motions for summary judgment are currently pending before the Court: Defendant and Third-Party Plaintiff Travelers' motion for partial summary judgment (Dkt. No. 510); Plaintiff Danaher and Third-Party Defendant Atlas Copco's motion for partial summary judgment (Dkt. No. 519); motions for summary judgment by all Excess Insurers except American Home (Dkt. Nos. 483, 488, 492, 496, 498, 503, 515, 520, 531); and motions for summary judgment by all Post-Acquisition Insurers except Industria (Dkt. Nos. 504, 517, 529, 551).  The motions have been fully briefed (*see* Dkt. Nos. 483–656), and the Court is now prepared to rule.

## II.    Legal Standards

### A.    Summary Judgment Standard

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

In reviewing a motion for summary judgment, a court must consider the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). Accordingly, "the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Finally, in cases involving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

**B.      Governing Law**

**1.      Principles of Contract Interpretation**

The parties largely agree that New York law governs the coverage disputes at issue. Under New York law, "[i]t is well established that" courts "determining a dispute over insurance coverage [must] first look to the language of the policy." *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 21 N.Y.3d 139, 148 (2013) (second quoting *Consol. Edison Co. of N.Y. v Allstate Ins. Co.*, 98 N.Y.2d 208, 221 (2002)). The language of the policy is then to be "interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012) (applying New York law). Doing so mandates that "the language of the 'contracts . . . be interpreted according to common speech and consistent with the reasonable expectation of the average insured.'" *In re Viking Pump, Inc.*, 27

N.Y.3d 244, 257 (2016) (quoting *Dean v. Tower Ins. Co. of N.Y.*, 19 N.Y.3d 704, 708 (2012)). In addition, courts "must construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Id.* (quoting *Roman Catholic Diocese of Brooklyn*, 21 N.Y.3d at 148).

Ambiguities in contract language must be construed in favor of the insured. *Id.* But "a contract is not ambiguous 'if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* at 258 (alteration in original) (quoting *Selective Ins. Co. of Am. v. Cty. of Rensselaer*, 26 N.Y.3d 649, 655 (2016)). "The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." *Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 33 (2d Cir. 1999) (quoting *In re Prudential Lines Inc.*, 158 F.3d 65, 77 (2d Cir. 1998)) (collecting cases applying New York law). "If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *Liberty. Mut. Ins. Co. v. Fairbanks Co.*, 170 F. Supp. 3d 634, 642–43 (S.D.N.Y. 2016) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993)) (collecting cases applying New York law).

### 2. Allocation of Insurance Coverage for Long-Tail Claims

Courts applying New York law have in recent years struggled to resolve insurance coverage and allocation disputes in the context of so-called "long-tail claims," and in particular, coverage disputes involving claims premised on "personal injuries due to toxic exposure and property damage resulting from gradual or continuing environmental contaminations." *In re Viking Pump*, 27 N.Y.3d at 255. The difficulty with coverage disputes involving long-tail claims arises from the fact that "[t]hese types of claims . . . often involve exposure to an injury-inducing

harm over the course of multiple policy periods, spawning litigation over which policies are triggered in the first instance, how liability should be allocated among triggered policies and the respective insurers, and at what point insureds may turn to excess insurance for coverage." *Id.*

Courts have generally adopted either of two competing methods of allocation for these types of claims: all sums or pro rata. Under the "all sums" method, which is also sometimes referred to as the joint-and-several method, an insured is entitled "to collect its total liability . . . under any policy in effect during the periods that the damage occurred," and is limited in its ability to recover from any single insurer only by that insurer's specific policy limits. *Id.* (alteration in original) (quoting *Roman Catholic Diocese of Brooklyn*, 21 N.Y.3d at 154) (internal quotation marks omitted). In contrast, under the "pro rata" method, "an insurer's liability is limited to sums incurred by the insured *during the policy period*; in other words, each insurance policy is allocated a 'pro rata' share of the total loss representing the portion of the loss that occurred during the policy period." *Id.* (emphasis added). "Pro rata shares are often, although not exclusively, calculated based on an insurer's 'time on the risk,' a fractional amount corresponding to the duration of the coverage provided by each insurer in relation to the total loss." *Keyspan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 31 N.Y.3d 51, 58 (2018).

Unlike the courts of the many states that have adopted a preference for either pro rata or all sums allocation, *see In re Viking Pump*, 27 N.Y.3d at 256–57 (surveying cases), "New York [courts] have not adopted a strict pro rata or all sums allocation rule," *Keyspan Gas*, 31 N.Y.3d at 58. Instead, "the method of allocation is governed foremost by the particular language of the relevant insurance policy." *Id.* Accordingly, in a case governed by New York law, different insurance policies may dictate the application of either the pro rata or the all sums methods of allocation, and the method of allocation to be applied under any given policy is to be determined

based on an assessment of the particular policy language agreed upon by the insured and the insurer.  *See id.* at 58–59; *see also In re Viking Pump*, 27 N.Y.3d at 257.

Recent New York Court of Appeals cases provide some guidance to courts seeking to divine party intent with respect to either all sums or pro rata allocation from boilerplate insurance policy language.  As is relevant here, the New York Court of Appeals

> held in *Consolidated Edison Co. of N.Y. v*[.] *Allstate Ins. Co.* that policy language restricting an insurer's liability to all sums incurred and occurrences happening "during the policy period" generally supports a pro rata allocation.  [*See Consol. Edison Co. of N.Y.*, 98 N.Y.2d at 224].  As [the Court of Appeals in *Consolidated Edison*] explained, the policies at issue there contained such language providing "for liability incurred as a result of an accident or occurrence during the policy period, not outside that period," and [the Court of Appeals] concluded that "[p]roration of liability . . . acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period[.]" [*Id.*]

> [The New York Court of Appeals] subsequently distinguished the policy language in *Consolidated Edison* from that presented in *Matter of Viking Pump, Inc.* and held, in the latter case, that the presence of noncumulation and prior insurance provisions "plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence" and, therefore, require all sums allocation[.]  [*In re Viking Pump*, 27 N.Y.3d at 261].  Such provisions are inconsistent with pro rata allocation because "the very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period," such that no two insurance policies indemnify the same loss or occurrence absent overlapping or concurrent policy periods[.]  [*Id.*]

*Keyspan Gas*, 31 N.Y.3d at 58–59 (cleaned up).  Finally, and most recently, the New York Court of Appeals in *Keyspan Gas* explained that application of the pro rata approach mandates that an insured bear the risk of loss for any periods in which it went without insurance or where its insurers have become insolvent, regardless of whether or not other insurance was available on the market during those periods.  *Id.* at 60–63.  The *Keyspan Gas* court reasoned that allocating such losses to an insurer for periods where it was not "on the risk" would violate the terms of the parties' agreements, as well as the insured's coverage expectations.  *See id.*

## III. Travelers' Motion

The Court first addresses Travelers' motion for partial summary judgment. (*See* Dkt. No. 510.) Travelers chiefly seeks a declaration that under governing New York law, and most particularly under *Keyspan Gas*, Travelers may be held responsible for costs stemming from the Underlying Claims only to the extent that those costs are allocable to it under the pro rata, time-on-the-risk method of allocation. (Dkt. No. 562 at 13–16.) Moreover, to the extent that Travelers has borne a disproportionate share of such costs to date, Travelers seeks the equitable remedy of contribution from the other parties in this action, in proportion to each party's pro rata obligations with respect to the Underlying Claims. (Dkt. No. 562 at 16–23.) Danaher and Atlas Copco (Dkt. No. 605), NR (Dkt. No. 573), Zurich (Dkt. No. 581), Trygg-Hansa (Dkt. No. 629), Unigard (Dkt. No. 593), and Wausau (Dkt. No. 592) have each filed oppositions to Travelers' motion.

### A. Method of Allocation of Indemnity Costs

Travelers seeks a declaration that the pro rata, time-on-the-risk method of allocation should be applied with respect to the allocation of indemnity costs to Travelers under any of its policies that provide coverage for only those bodily injuries that "occur[] during the policy period" at issue and that do not contain non-cumulation clauses. (*See* Dkt. No. 643 at 1–5.) The Travelers policies at issue in this suit almost all define a covered "bodily injury" as a "bodily injury, sickness or disease sustained by any person which *occurs during the policy period*, including death at any time resulting therefrom[.]" (*See, e.g.*, Dkt. No. 565-1 at 4 (emphasis added).) The Court agrees with Travelers that the pro rata method of allocation is called for under New York law for the Travelers policies containing the "occurs during the policy period" language, at least where the policy does not contain a non-cumulation clause or other similar

14

language evidencing the understanding that two or more insurance policies that do not overlap in time might indemnify the insured with respect to the same loss or occurrence.

As the New York Court of Appeals has explained, "policy language restricting an insurer's liability to all sums incurred and occurrences happening 'during the policy period' generally supports a pro rata allocation." *Keyspan Gas*, 31 N.Y.3d at 58. To the extent that Travelers' policies contain such language and do not also contain a non-cumulation clause, the only plausible reading of those policies is that they provide coverage "for liability incurred as a result of an accident or occurrence during the policy period, not outside that period." *Id.* (quoting *Consol. Edison Co. of N.Y.*, 98 N.Y.2d at 224). Importantly, this conclusion holds regardless of whether or not Chicago Pneumatic either has or had access to coverage under other insurance policies during any particular period of time. Allowing Chicago Pneumatic to obtain coverage from Travelers under the sort of policies described here for occurrences outside of the periods for which Chicago Pneumatic in fact paid premiums and retained coverage from Travelers would be "inconsistent with the contract language that provides the foundation for the pro rata approach — namely, the 'during the policy period' limitation — [because] to allocate risk to the insurer for years outside the policy period would be to ignore the very premise underlying pro rata allocation." *Id.* at 61.

Danaher and Atlas Copco concede that all but one of Travelers' policies fit this description and thus should be subject to pro rata allocation. (*See* Dkt. No. 522 at 9.) Danaher and Atlas Copco contend, however, that one of Travelers' policies does contain a non-cumulation clause or its equivalent. (*See id.*; *see also* Dkt. No. 605 at 15–16.) The Court addresses that contention below in connection with its discussion of Danaher and Atlas Copco's motion for summary judgment. *See infra* Section IV.A.

Applying the pro rata method here in order to allocate indemnity costs to Travelers' policies may be effectuated with the use of a relatively simple formula that has been employed effectively by a number of other courts presiding over allocation disputes involving long-tail claims: Travelers' pro rata share of indemnity costs stemming from the Underlying Claims will be "determined by multiplying the judgment or settlement by a fraction that has as its denominator the entire number of years of the claimant's injury, and as its numerator the number of years within that period when the policy was in effect." *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1202 (2d Cir. 1995); *see also Keyspan Gas*, 31 N.Y.3d at 58 ("Pro rata shares are often, although not exclusively, calculated based on an insurer's 'time on the risk,' a fractional amount corresponding to the duration of the coverage provided by each insurer in relation to the total loss."); *Consol. Edison Co. of N.Y.*, 98 N.Y.2d at 224–25 (approving of the use of this method).

Accordingly, to the extent that Chicago Pneumatic obtained primary coverage from Travelers with occurrence-based policies that lack non-cumulation clauses or other language evidencing the parties' understanding that any given occurrence could trigger more than one successive policy, Travelers may be allocated indemnification costs under those policies with respect to the Underlying Claims only to the extent that Travelers was in fact "on the risk" for such costs. Determining the extent to which Travelers was "on the risk" will be done by "multiplying the judgment or settlement" associated with a given Underlying Claim "by a fraction that has as its denominator the entire number of years of the claimant's injury, and as its

numerator the number of years within that period when the policy was in effect."[5] *Stonewall Ins. Co.*, 73 F.3d at 1202.

## B. Contribution for Indemnification and Defense Costs

Travelers moves for a contribution award compensating Travelers to the extent that it has borne or will bear a disproportionate share of either defense or indemnification costs associated with the Underlying Claims. (Dkt. No. 562 at 19–23.)

"New York law recognizes a cause of action for pro rata contribution when a co-insurer pays more than its fair share for a loss covered by multiple insurers." *Nat'l Cas. Co. v. Vigilant Ins. Co.*, 466 F. Supp. 2d 533, 540 (S.D.N.Y. 2006) (collecting cases). An insurer's right to contribution from others responsible for insuring the same risks as the insurer is rooted not in contract law, but rather "flow[s] from equitable principles." *Md. Cas. Co. v. W.R. Grace & Co.*, 218 F.3d 204, 211 (2d Cir. 2000). Accordingly, "[w]here more than one insurer has issued policies covering the same risk, a court of equity will exercise jurisdiction over the entire controversy to resolve the rights of all the interested parties." *Id*.

The right to contribution may be applied in the context of an insurer's overpayment of *both* indemnification *and* defense costs. *See, e.g.*, *Nat'l Cas. Co.*, 466 F. Supp. 2d at 540 (allowing contribution "when a co-insurer pays more than its fair share for a loss covered by multiple insurers"); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 774 F. Supp. 1416, 1436–37 (S.D.N.Y. 1991) (applying a pro rata allocation methodology under New York law to determine proportion of contribution to defense costs); *Fed. Ins. Co. v. Atl. Nat'l Ins. Co.*, 25 N.Y.2d 71, 78–79 (1969) ("As both policies assumed the same risk, both were obligated to defend [the

---

[5] The Court discusses below the method that will be employed for determining the denominator of the aforementioned equation, namely the trigger date for the "number of years of the claimant's injury" for any given Underlying Claim. *See infra* Section III.C.

insured] in a suit brought against [it] and both must contribute, pro rata, toward payment of the cost of the settlement and legal fees and other expenses of the litigation."); *cf. Cont'l Cas. Co. v. Rapid-Am. Corp.*, 80 N.Y.2d 640, 655–56 (1993) ("When more than one policy is triggered by a claim, pro rata sharing of defense costs may be ordered, but we perceive no error or unfairness in declining to order such sharing, with the understanding that the insurer may later obtain contribution from other applicable policies."). With respect to calculating contribution for defense costs, courts often deem the most "workable and equitable approach [to be to mandate that] apportionment of defense costs . . . follow the method for apportionment of indemnification costs." *Avondale Indus.*, 774 F. Supp. at 1437.

As the foregoing authorities make clear, Travelers is entitled to contribution from any other parties in this action that may also be allocated responsibility for defending or indemnifying the Underlying Claims, up to the extent that Travelers has expended or will expend either indemnification or defense costs in excess of its pro rata share of responsibility for the Underlying Claims. The parties responsible for contribution for any given Underlying Claim thus may include Chicago Pneumatic's excess insurers for the years in which Chicago Pneumatic's underlying primary insurance has been or becomes exhausted, or Danaher and Atlas Copco, pursuant to *Keyspan Gas* and sections 11(a) and 11(h) of the SPA, for years in which Chicago Pneumatic was uninsured or where its insurers have become insolvent. The Court explains in greater detail below the extent to which any other parties may or may not be responsible for pro rata contributions to Travelers for costs incurred in connection with the Underlying Claims allocable to any given year.

Danaher and Atlas Copco object to Travelers' attempts to obtain contribution from them for defense costs. The Court finds their objections to this aspect of Travelers' contribution claim

unavailing.  Danaher and Atlas Copco primarily argue that Travelers' request for contribution for defense costs amounts to a request for reconsideration of this Court's September 2012 summary judgment order declaring that Travelers has a duty to defend Chicago Pneumatic against the Underlying Claims.  (*See* Dkt. No. 605 at 2–3, 6–7; *see also* Dkt. No. 575-6 at 57–61.)  But at issue in this motion is not whether Travelers continues to be responsible for defending the Underlying Claims in the first instance.  To the extent there is any doubt, the Court now reaffirms its prior summary judgment order holding that Travelers, as the primary insurer of the risks of loss posed by the Underlying Claims for a number of years with respect to which Travelers maintains unexhausted primary policies, has a continuing duty to defend the Underlying Claims in the first instance.  (*See* Dkt. No. 575-6 at 59.)

Instead, what is at issue here is a question the Court has not yet answered, and one it could not have answered until an allocation methodology for the Underlying Claims had been adopted:  whether Travelers may obtain contribution after the fact for defense costs it expends in fulfillment of its duty to defend against the Underlying Claims, particularly where those claims involve injuries that span across years for which other parties are to be allocated some share of the risk.  The answer to that question is "yes."  Indeed, the Court expressly held in its prior ruling with respect to Travelers' duty to defend that Travelers' obligation to bear defense costs "would [obviously not] apply to those years" where Travelers' policies had been exhausted.  (Dkt. No. 575-6 at 61.)  And a court may, as this Court has, order only one insurer to provide for an insured's defense costs in the first instance with the "understanding that the insurer may later obtain contribution from other applicable policies" also responsible for the underlying claims.  *Rapid-Am. Corp.*, 80 N.Y.2d at 655–56.  Travelers, which has been and continues to be fulfilling its duty to defend, is thus entitled to seek contribution from other parties for their share of the

defense costs incurred by Travelers in connection with claims for which multiple parties will ultimately bear shared responsibility. Now that the Court has assessed how and to what extent other parties to this suit will be allocated such responsibilities, Travelers' request for contribution for defense costs has become ripe.

Danaher and Atlas Copco also argue that they cannot be made to contribute to Travelers' defense costs because they stand in the shoes of an insured rather than an insurer. (Dkt. No. 605 at 10–13.) But if Danaher and Atlas Copco, as owners and/or indemnifiers of the insured Chicago Pneumatic, are themselves to be among the parties responsible for indemnifying the Underlying Claims by virtue of Chicago Pneumatic's failure to obtain insurance for any given period of time, *see Keyspan Gas*, 31 N.Y.3d at 60–63, the Court can identify no compelling basis for excusing them from contributing to defense costs for those periods as well. *Cf. Avondale Indus.*, 774 F. Supp. at 1437 ("In the absence of a binding legal rationale or a compelling logical one, we see no reason to encourage even greater complexity and confusion in multiple insurer coverage litigation by applying to one dispute between the same insurers different apportionment rules for indemnification payments and defense costs.").

Instead, the Court finds persuasive the reasoning of those cases that under similar circumstances have required an "insured [to] pay its fair share for the defense of the non-covered risk," at least so long as "defense costs can be readily apportioned." *Generali-U.S. Branch v. Caribe Realty Corp.*, No. 25499/91, 1994 WL 903279, at *2 (N.Y. Sup. Ct. Dec. 5, 1994); *see also, e.g.*, *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224–25 (6th Cir. 1980) ("An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured

must pay its fair share for the defense of the non-covered risk.").  And here, defense costs can be readily apportioned, as "apportionment of defense costs [may] follow the method for apportionment of indemnification costs" described above.  *Avondale Indus.*, 774 F. Supp. at 1437.  The Court declines Danaher and Atlas Copco's invitation to complicate this apportionment, particularly in a manner that would be inconsistent with the principle from *Keyspan Gas* that an insured must bear the risk of loss allocable to any years in which the insured went without coverage.

The Excess Insurers also object to Travelers' motion for summary judgment to the extent that Travelers seeks a declaration of its right to contribution from them.  The Excess Insurers, and chiefly NR, argue that under New York law they cannot be made to contribute to defense costs incurred by Travelers, a primary insurer, due to their status as excess insurers.  (*See* Dkt. No. 573 at 7–8; Dkt. No. 592 at 10–11 (Wausau's argument that its status as an excess insurer precludes Travelers from seeking contribution for defense costs); Dkt. No. 593 (Unigard's partial joinder in NR's motion).)  It is certainly true that a primary insurer "generally has no entitlement to contribution from an excess insurer." *Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co.*, 16 N.Y.3d 257, 265 (2011) (internal quotation marks and citation omitted).  The Court does not question the propriety or correctness of that principle.  Applying that principle to the circumstances of this case, the Excess Insurers are correct in arguing that to the extent that any given Excess Insurer's policy goes untriggered, Travelers will not be entitled to contribution from that Excess Insurer with respect to the indemnification or defense costs associated with the Underlying Claims.

However, by the time of the briefing of these motions, the primary Travelers policies covering Chicago Pneumatic from April 1, 1979 to April 1, 1982 had been exhausted, thus

triggering the NR excess policy that sits directly above them. (*See* Dkt. No. 565 ¶ 8; Dkt. No. 574 ¶ 19; Dkt. No. 604 ¶ 1; Dkt. No. 607 ¶ 16; Dkt. No. 610-1, 610-2.) NR is thus no longer able to take shelter from Travelers' contribution claims by virtue of its status as an excess insurer. Instead, NR now sits in the position of a primary insurer of the risks of loss stemming from the Underlying Claims, at least for losses allocable to the years 1979 to 1982. *See Ali v. Fed. Ins. Co*., 719 F.3d 83, 90 (2d Cir. 2013) ("Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted." (quoting *Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co.*, 514 F.3d 327, 329 (4th Cir.2008))).

The terms of the relevant triggered NR policy confirm that this is the case. Specifically, NR's triggered excess policy provides that once all underlying primary insurance is exhausted, the NR policy "*shall apply as underlying insurance*, notwithstanding anything to the contrary in the terms and conditions of th[e] policy." (Dkt. No. 575-2 at 7 (emphasis added).) And the NR policy sitting directly above the exhausted 1979 to 1982 Travelers policies expressly provides that NR will "[d]efend any suit against the Insured [*i.e.*, Chicago Pneumatic] seeking damages on account of personal injuries" covered by the NR policies. (Dkt. No. 575-2 at 4.) Based on the plain and unambiguous terms of these policies, and notwithstanding NR's attempts to insert ambiguity into the meaning of these contract provisions in briefing these motions (*see* Dkt. No. 573 at 5–7), the Court concludes that NR now stands in the shoes of a primary insurer of Chicago Pneumatic for the years 1979 to 1982. And because NR's policy includes a promise to defend claims premised on injuries occurring during the years that NR now insures (Dkt. No. 575-2 at 4), Travelers is presently entitled to contribution from NR for both defense and indemnity costs paid by Travelers and allocable to those years. Indeed, Travelers confirms that it seeks no more than that at this stage. (*See* Dkt. No. 606 at 8 n.3 (confirming that Travelers seeks

immediate contribution from NR only "under the 1979-82 [NR] Umbrella Policy, where it cannot be disputed that the underlying primary Travelers Policies have been exhausted").)

Accordingly, at this moment in time, both Danaher and Atlas Copco, pursuant to *Keyspan Gas* and sections 11(a) and 11(h) of the SPA, as well as NR, pursuant to its triggered 1979 to 1982 excess policy sitting directly above the exhausted Travelers policies, may be held responsible for providing contribution to Travelers. Danaher, Atlas Copco, and NR shall be responsible for contributing a pro rata share of both defense and indemnity costs incurred by Travelers in connection with the Underlying Claims where those costs are allocable to claims involving injuries occurring during periods for which those parties are "on the risk." The same will hold true for any other Excess Insurer whose policy may become triggered with respect to the Underlying Claims.[6]

## C.      Trigger Date for the Underlying Claims

Now that the Court has determined that the costs borne or to be borne by Travelers defending and indemnifying the Underlying Claims shall be allocated on a pro rata basis among those other parties also on the risk for any of those claims, the Court is left with the task of determining what constitutes a triggering event in the context of a long-tail claim. Travelers suggests that the Court apply the "injury-in-fact" trigger of coverage endorsed by the New York Appellate Division, First Department in *Continental Casualty Co. v. Employers Insurance Co. of Wausau* ("*Keasbey*"), 871 N.Y.S.2d 48 (App. Div. 1st Dep't 2008), for purposes of allocating costs stemming from Underlying Claims (Dkt. No. 562 at 23–25). However, the Court agrees with Danaher and Atlas Copco that this Court is bound to apply the triggering analysis endorsed

---

[6] To the extent that any of the Post-Acquisition Insurers contest Travelers' claims for contribution against them (*see, e.g.*, Dkt. Nos. 581, 629), the Court addresses the substance of their arguments in the context of the Post-Acquisition Insurers' motions for summary judgment, *see infra* Section VI.

by the Second Circuit in *Stonewall Insurance Co. v. Asbestos Claims Management Corporation*, 73 F.3d 1178 (2d Cir. 1995), which the Court now holds is applicable to both the asbestos- and silica-based bodily-injury lawsuits comprising the Underlying Claims.

In *Stonewall*, the Second Circuit was called on to determine the trigger date for asbestos claims under certain "'occurrence-based' policies [that] respond[ed] to [the insured's] liabilities arising out of 'bodily injury' . . . that took place during the time that such policies were in effect, even [where] the claim [was] not made until years after the termination of the policy." *Id.* at 1192. The *Stonewall* court ultimately held that under New York law, "triggering can be shown by competent evidence to result at successive points where 'identifiable injuries' have occurred," including "*at any or all points* from exposure to manifestation, on the ground that identifiable injuries have been proved to have occurred at each point to a reasonable degree of medical certainty." *Id.* at 1194 (second quoting *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 565 F. Supp. 1485, 1498 (S.D.N.Y. 1983)). Applying that standard, the *Stonewall* court affirmed a jury's finding that an insurer's policies were triggered by underlying asbestos bodily-injury claims "from the date of first exposure to the date of death or claim, whichever is earlier." *Id.* at 1199; *see also id.* at 1191 (summarizing these holdings).

Travelers urges this Court to instead apply the *Keasbey* court's "injury-in-fact test[,] [which] rests on when the injury, sickness, disease or disability actually began." *Keasbey*, 871 N.Y.S.2d at 63. But *Keasbey* is inapposite, and may not even be binding on this Court to the extent that it contradicts *Stonewall*. *Keasbey* involved a group of underlying plaintiffs who had prosecuted certain asbestos claims for years exclusively as products-liability claims, but then elected to shift gears once the underlying defendant's insurance policy limits on products-liability claims had been reached, and then began to prosecute their claims only as negligent-

installation claims. *Id.* at 51–52. The *Keasbey* court was thus called upon to consider whether the underlying plaintiffs could establish the requisite triggering of the relevant insurance policies by what were purportedly operations-liability claims rather than products-liability claims. *See id.* at 63–64. The *Keasbey* court then expressly distinguished its injury-in-fact analysis for those operations-liability claims from the analysis applicable to "[r]ecovery under products liability claims[,] [which] is not dependent, as" was the analysis of the operations-liability claims of the plaintiffs in *Keasbey*, "on the timing of the actual injury nor the particular stage of installation projects at which actual injury may have taken place." *Id.* at 64. The *Keasbey* court thus had no occasion to reach the question that matters with respect to the triggering of the products-liability Underlying Claims here: namely, whether first exposure might suffice as a triggering "injury in fact" for silica- or asbestos-based bodily injury claims premised on products liability. *Stonewall*'s answer to that question in the affirmative remains unassailed by *Keasbey*.

In any event, even if *Keasbey*'s triggering analysis did apply to the products liability Underlying Claims, which it does not, this Court would still be constrained to follow *Stonewall*. *See, e.g.*, *Musah v. Houslanger & Assocs., PLLC*, No. 12 Civ. 3207, 2012 WL 5835293, at *3 (S.D.N.Y. Nov. 16, 2012) ("[A]bsent a contrary holding by the New York Court of Appeals, the Second Circuit's holding[s] . . . [are] binding authority . . . for federal district courts within the Circuit."); *Petrosky v. N.Y. State Dep't of Motor Vehicles,* 72 F. Supp. 2d 39, 65 (N.D.N.Y. 1999) ("[T]he most important precedential authority presented [as between lower New York courts and Second Circuit case law] is that from the Second Circuit as this Court is bound by its decisions of law."). *But see In re E. & S. Dists. Asbestos Litig.*, 772 F. Supp. 1380, 1391 (S.D.N.Y. 1991) ("Where a conflict exists between holdings of the Second Circuit and more recent determinations of state appellate courts, this court will follow the outcome it believes the

New York Court of Appeals would reach, without giving binding authority to the Second Circuit's construction of the state statute."), *rev'd in part on other grounds*, *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir.1992).

Finally, the Court also agrees with Danaher and Atlas Copco that it would be inappropriate to require Chicago Pneumatic to prove a case against itself in order to establish a triggering event sufficient to establish its right to coverage for the Underlying Claims. (*See* Dkt. No. 609 at 20–21.) To the extent that any of the Underlying Claims are settled without factual findings regarding dates of first exposure, the parties shall be guided by the Second Circuit's maxim that an "insured need not establish actual liability to the party with whom it has settled 'so long as . . . a potential liability on the facts known to the [insured is] shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the [insured].'" *Luria Bros. & Co. v. All. Assurance Co.*, 780 F.2d 1082, 1091 (2d Cir. 1986) (alterations in original) (quoting *Damanti v. A/S Inger,* 314 F.2d 395, 397 (2d Cir. 1963)). Any other conclusion would put Atlas Copco and Danaher in the "hopelessly untenable position of having to refute liability in the underlying action until the moment of settlement, and then of turning about face to prove liability in the insurance action." *Uniroyal, Inc. v. Home Ins. Co.,* 707 F. Supp. 1368, 1378 (E.D.N.Y. 1988).

In sum, the Court holds that a triggering injury in fact for the Underlying Claims may be found as early as the time of first exposure to asbestos or silica, and may continue progressively through the claimant's death or the date of filing the claim, whichever occurs earlier.

## IV.     Danaher and Atlas Copco's Motion

The Court turns now to Danaher and Atlas Copco's joint motion for partial summary judgment. (Dkt. No. 519.) Their motion seeks rulings establishing the methodology by which the costs associated with the Underlying Claims are to be allocated among Chicago Pneumatic's

pre-1987 insurers (Dkt. No. 522 at 6–12), the lack of aggregate limits for coverage of bodily-injury claims in the Travelers policies covering the years 1970, 1971, and 1972 (Dkt. No. 522 at 12–16), and the existence and terms of certain yet-unlocated primary policies allegedly issued by Travelers' predecessor to Chicago Pneumatic covering the years prior to 1961 and the year 1962 (Dkt. No. 522 at 16–24). Danaher and Atlas Copco's motion is opposed in whole or in part by NR (Dkt. No. 576), Unigard (Dkt. No. 579), Allianz (Dkt. No. 585), TIG (Dkt. No. 588), Wausau (Dkt. No. 591), and Travelers (Dkt. No. 618). It is joined in part by Excess Insurers American Home, Granite State, National Union, and OneBeacon. (Dkt. Nos. 541–42.)

### A. Method of Allocation

Danaher and Atlas Copco contend that there is no genuine dispute that governing New York law mandates the application of the "all sums" method of allocation when distributing indemnification costs among Chicago Pneumatic's pre-1987 insurers whose policies contain non-cumulation clauses. (Dkt. No. 522 at 6–12.) The Court agrees.

As the New York Court of Appeals has explained, it is "inconsistent with the language of . . . non-cumulation clauses to use pro rata allocation." *In re Viking Pump*, 27 N.Y.3d at 261. This is because "[s]uch policy provisions plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence by acknowledging that a covered loss or occurrence may 'also [be] covered in whole or in part under any other excess [p]olicy issued to the [insured] prior to the inception date' of the instant policy." *Id.* (alterations in original). Thus, a "non-cumulation clause negates th[e] premise [underlying pro rata allocation] by presupposing that two policies may be called upon to indemnify the insured for the same loss or occurrence." *Id.* Accordingly, when allocating coverage costs under New York law among insurance "policies containing non-cumulation clauses or non-cumulation and prior insurance provisions, . . . all sums is the appropriate allocation method." *Id.* at 260–61.

Applying that reasoning here, the Court concludes that the "all sums" method of allocation must be used to allocate costs among Chicago Pneumatic's insurers from the years prior to Danaher's sale of Chicago Pneumatic to Atlas Copco whenever an insurer's triggered policy contains a non-cumulation clause comparable to the clauses that the New York Court of Appeals interpreted in *Viking Pump*. A number of the Excess Insurers' policies contain non-cumulation clauses that substantively mirror, and indeed match nearly word-for-word, key portions of the *Viking Pump* non-cumulation clauses, in that the clauses all clearly contemplate the possibility of the same loss triggering multiple prior or successive policies. For example, NR's policy covering the period from April 1, 1976 to April 1, 1979 provides that:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Insured *prior to the inception date* hereof the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such *prior* insurance.

(Dkt. No. 527-3 at 3 (emphases added).) Many other of the Excess Insurers' policies contain non-cumulation clauses nearly identical to the one in NR's 1976 to 1979 policy. (*See, e.g.*, Dkt. No. 485-4 at 5 (American Home's 1972 to 1975 policy's nearly identical non-cumulation provision); 494-2 at 12 (Allianz's 1985 to 1986 policy's nearly identical non-cumulation provision which also guarantees coverage for injuries that are "continuing at the time of termination" of the policy); Dkt. No. 523-1 at 4 (Unigard's 1974 to 1977 policy's nearly identical non-cumulation provision which also which also guarantees coverage for injuries that are "continuing at the time of termination" of the policy).) And these clauses each mirror the language of the non-cumulation clauses that were before the New York Court of Appeals in *Viking Pump* when it determined that the presence of such a non-cumulation clause in an excess insurer's policy warrants the application of "all sums" allocation. Specifically, each of these clauses uses temporal language and references prior or successive policies, thereby evincing the

parties' understandings that the same injury or occurrence could trigger multiple prior or successive policies covering different periods. *See In re Viking Pump*, 27 N.Y.3d at 252 (considering policy language also providing that "[i]t is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess Policy issued to the Insured *prior to the inception date hereof*[,] the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss under such *prior* insurance" (emphases added) (alterations in original)). This Court thus also "hold[s] that all sums allocation is appropriate in policies containing such provisions, [just] like the ones at issue" in *Viking Pump*. *Id.* at 264.

But because "New York[] [courts] have not adopted a strict pro rata or all sums allocation rule," and as "the method of allocation is [to be] governed foremost by the particular language of the relevant insurance policy," *Keyspan Gas*, 31 N.Y.3d at 58, a different conclusion is warranted with respect to Chicago Pneumatic's pre-1987 insurance policies that do not contain non-cumulation clauses, *see supra* Section III.A. For example, with one exception, Danaher and Atlas Copco concede that none of Chicago Pneumatic's unexhausted pre-1987 primary insurance policies contain non-cumulation clauses or other comparable provisions indicating the possibility that a given loss could be covered by more than one insurance policy. (*See* Dkt. No. 522 at 9.) And Danaher and Atlas Copco agree with Travelers that these policies all should be subject to pro rata allocation. (*See id.*; *see also* Dkt. No. 643 at 3.) Accordingly, allocation of indemnification costs under these Travelers primary policies will be done pursuant to the pro rata method, and will be calculated in the manner directed by the Court above. *See supra* Section III.A.

Danaher and Atlas Copco contend, however, that one of Travelers' unexhausted policies does contain a non-cumulation clause or its equivalent, and that the presence of that clause

warrants applying all sums allocation of costs under that policy pursuant to *Viking Pump*.  (*See* Dkt No. 522 at 8–9.)  That clause is a "Limits of Liability, Two or More Policies" clause from the Travelers policy in effect from April 1, 1985 through April 1, 1986, and it provides that

> [i]n the event of an *injury, damage or loss covered by this policy and any other policy containing this provision* or a similar provision issued by [Travelers] to [Chicago Pneumatic], the maximum that will be paid under all such policies combined for such injury, damage or loss is the highest applicable limit of liability of any one of such policies.  This provision does not apply with respect to any policy issued by [Travelers] which has a policy number containing [certain] letters . . . or any personal liability policy issued by [Travelers.]

(Dkt. No. 527-4 at 3 (emphasis added).)  According to Danaher and Atlas Copco, "[t]he italicized language above, although not identical to the non-cumulation clauses quoted in *Viking Pump*," serves a similar purpose, because it "presupposes that [a] loss will be covered by more than one policy and one policy period, making this provision a non-cumulation clause and subjecting the policy to an all sums allocation."  (Dkt. No. 522 at 9.)

The Court disagrees.  Contrary to Danaher and Atlas Copco's contentions, the "Two or More Policies" clause contains no language indicating the possibility of a loss being "covered by more than . . . one policy *period*."  (*Id.* (emphasis added).)  Importantly, unlike the non-cumulation clauses at issue in *Viking Pump*, each of which explicitly referenced the possibility of injuries occurring "partly *before* and partly *within* any annual period of this policy" or "*prior* insurance" that had been "issued to the Insured *prior to the inception date*" of the relevant policies, there is no similar temporal language in the "Two or More Policies" provision indicating the parties' understanding "that multiple *successive* insurance policies can indemnify the insured for the same loss or occurrence."  *In re Viking Pump*, 27 N.Y.3d at 252, 261 (emphases added).  The absence of any such temporal language leads to the conclusion that the "Two or More Policies" language was intended to prevent Chicago Pneumatic's stacking of

*concurrent* policies issued by Travelers. Given that pro rata allocation is generally appropriate where, as here, insurance "policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period," *Consol. Edison Co. of N.Y.*, 98 N.Y.2d at 224, Danaher and Atlas Copco's failure to identify a clause in the April 1, 1985 to April 1, 1986 Travelers policy that clearly contemplates the policy's coverage of risks also covered by other *prior* or *successive* policies defeats their contention that Travelers and Chicago Pneumatic had agreed that Travelers would assume joint and several liability for all losses covered by that policy. Instead, notwithstanding the policy's "Two or More Policies" provision, this policy, like all of Travelers' other unexhausted primary policies, is subject to pro rata allocation.

Finally, to the extent that the Excess Insurers present any other arguments in opposition to Danaher and Atlas Copco's proposed allocation methodology (*see, e.g.*, Dkt. No. 591 at 5–8 (Wausau arguing that the claims against it should be dismissed because there is no practical likelihood its policies will be reached); Dkt. No. 576 at 3–4 (NR arguing that Travelers is responsible for all defense costs associated with the Underlying Claims)), those arguments are addressed elsewhere in this opinion, *see supra* Section III.B; *infra* Section V.A.

### B. The Disputed Aetna Policies

Danaher and Atlas Copco move for summary judgment with respect to the existence and terms of various yet-unlocated insurance policies allegedly issued by Aetna, Travelers' predecessor-in-interest, providing Chicago Pneumatic with primary coverage from December 31, 1946 through January 1, 1961, and from January 1, 1962 to January 1, 1963. (Dkt. No. 522 at 16–24.) Travelers opposes this aspect of Danaher and Atlas Copco's motion, arguing that the secondary evidence Danaher and Atlas Copco have produced to establish the existence and terms of these policies is insufficient as a matter of law. (Dkt. No. 618 at 16–23.)

New York law holds that an insured "may rely on secondary evidence (*i.e.*, evidence other than the policy itself) to prove the existence and terms" of an unlocated insurance policy, provided that the insured has conducted a "diligent but unsuccessful search and inquiry" for the missing policy. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002) (second quoting *Burt Rigid Box Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596, 612 (W.D.N.Y. 2001)). Courts are split with respect to whether the purportedly insured party in such a scenario carries the burden of proving the existence and terms of a lost policy by a preponderance of the evidence or by clear and convincing evidence. *Compare Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*, 828 F. Supp. 2d 481, 490 (N.D.N.Y. 2011) ("[T]he proper standard of proof [of the terms of a lost insurance policy] appears to be by clear and convincing evidence.") *and Boyce Thompson Inst. for Plant Research, Inc. v. Ins. Co. of N. Am.*, 751 F. Supp. 1137, 1140 (S.D.N.Y. 1990) ("Because lost insurance instruments are a common problem, a party seeking to recover upon a lost instrument must prove its former existence, execution, delivery and contents by clear, satisfactory and convincing evidence."), *with Bianchi v. Florists Mut. Ins. Co.*, 660 F. Supp. 2d 434, 437 (E.D.N.Y. 2009) (applying the preponderance of the evidence standard) *and Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.,* 661 N.Y.S.2d 948, 949–51 (Sup. Ct. 1997) (same). The Second Circuit has noted this split but has declined to decide the appropriate standard of proof. *Burt Rigid Box, Inc.*, 302 F.3d at 91.

In *Burt Rigid Box*, the Second Circuit affirmed a summary judgment award in favor of an insured with respect to the existence and terms of lost insurance policies that had allegedly been issued by Aetna. *Id.* at 93. The evidence cited by the Second Circuit as providing a basis for this decision included: business documents providing Aetna policy numbers and dates of coverage; an Aetna representative's acknowledged familiarity with the relevant policy numbers; financial

statements indicating the insured's retention of the policies; Aetna's records of payments under the policies; copies of correspondence between Aetna and the insured referencing claims under the policies; testimony from the insured that it had always retained insurance during the relevant periods; excess insurance policies referencing the Aetna policies; and testimony from a number of employees of the insured corroborating all of this evidence. *Id.* at 92–93. The Second Circuit deemed this "overwhelming documentary and testimonial evidence . . . establishing the existence of the policies" sufficient to "prove[] the existence and terms of the policies by clear and convincing evidence." *Id.* at 93.

As in *Burt Rigid Box*, the Court here need not decide the appropriate standard of proof with respect to establishing the existence and terms of lost insurance policies. *See also Fulton Boiler Works*, 828 F. Supp. 2d at 490 n.10 ("[T]he issue of which standard applies [for proving the existence or terms of a lost insurance policy] is immaterial because, as explained below, [the purported insured] cannot meet either standard."). This is because, with the exception of the period spanning from January 1, 1954 to January 1, 1956, discussed separately below, Danaher and Atlas Copco have produced evidence sufficient to establish the existence and terms of all of the alleged Aetna policies beyond any genuine dispute, even under the stricter "clear and convincing evidence" standard. (*See generally* Dkt. No. 648-1 (summarizing evidence produced by Danaher and Atlas Copco).)

With respect to the existence of the alleged Aetna policies providing coverage for the period spanning December 31, 1946 through January 1, 1954, Danaher and Atlas Copco have produced the following unrebutted evidence: (1) Travelers' own policy list referencing the relevant Aetna policies, with Chicago Pneumatic as the insured (Dkt. No. 527-12); (2) the deposition testimony of Travelers' designee describing this list (Dkt. No. 527-8 at 34:9–15);

(3) the deposition testimony of Chicago Pneumatic's former treasurer confirming that Chicago Pneumatic obtained insurance from Aetna "[e]very year" he was with the company (Dkt. No. 527-11 at 25:13; *see also id.* at 25:20–27:19), a period that spanned from 1942 to 1966 (Dkt. No. 521-11 at 19:17–19, 25:17–19); (4) certain "Binding Advices" produced by Travelers describing Aetna as having issued "Product Bodily Injury Liability" insurance to Chicago Pneumatic covering each of these years with coverage limits of $100,000 per person and $300,000 in the aggregate (Dkt. No. 527-14); and (5) correspondence from an Aetna insurance broker to Chicago Pneumatic in 1947 indicating that Aetna was Chicago Pneumatic's insurer during this period and referencing Chicago Pneumatic's "renewal" of its Aetna policies (Dkt. Nos. 527-15, 527-16). Travelers produces no evidence contradicting any of the foregoing. Instead, Travelers argues only that this evidence insufficient to meet Danaher and Atlas Copco's burden. (*See* Dkt. 618 at 18–20.) The Court is unpersuaded by Travelers' contentions. Danaher and Atlas Copco's unrebutted evidence demonstrating the existence of the Aetna policies providing coverage from December 31, 1946 through January 1, 1954, much of which was produced from Travelers' own records, and which is comparable in terms of both breadth and content to the types of evidence the Second Circuit deemed sufficient to satisfy the clear and convincing evidence standard at the summary judgment stage, *see Burt Rigid Box, Inc.*, 302 F.3d at 92–93, is sufficient to warrant summary judgment in favor of Danaher and Atlas Copco as to the existence of these policies.

A similar conclusion is called for with respect to the Aetna policies allegedly issued to Chicago Pneumatic and providing coverage from January 1, 1956 to January 1, 1961, and from January 1, 1962 to January 1, 1963. Danaher and Atlas Copco have introduced into the summary judgment record uncontradicted evidence, in the form of Travelers' own "Loss Records," identifying specific Aetna policy numbers covering Chicago Pneumatic for all of these periods

and indicating that Aetna even processed claims under these policies. (Dkt. No. 527-17.) In addition, Danaher and Atlas Copco cite a May 25, 1989 letter from Danaher's treasurer to Aetna identifying by number the policies that Aetna issued to Chicago Pneumatic for many of the years in question. (Dkt. No. 527-18.) Finally, this documentary evidence is again corroborated by the deposition testimony of Chicago Pneumatic's former treasurer confirming that Chicago Pneumatic obtained insurance from Aetna "[e]very year" he was with the company. (Dkt. No. 527-11 at 25:13; *see also id.* at 25:20–27:1.) Travelers introduces no facts or evidence rebutting what its own records confirm: that Aetna in fact issued insurance policies to Chicago Pneumatic during the relevant years. The Court thus concludes that the record contains clear and convincing evidence establishing beyond genuine dispute that Aetna issued policies to Chicago Pneumatic providing coverage from January 1, 1956 to January 1, 1961, and from January 1, 1962 to January 1, 1963.

In contrast, the Court agrees with Travelers that a different conclusion is warranted with respect the existence of any Aetna policies providing coverage from January 1, 1954 to January 1, 1956. (*See* Dkt. No. 618 at 20.) Atlas Copco and Danaher concede that they have produced no documentary evidence establishing the existence of these policies. (Dkt. No. 648 at 7.) Instead, they rely entirely on the deposition testimony of Chicago Pneumatic's former treasurer, who testified that he recalled that Chicago Pneumatic purchased product liability insurance from Aetna every year during his employment from 1942 to 1966. (Dkt. No. 527-11 at 25:9-27:1.) While this deposition testimony effectively corroborated the documentary evidence produced by Atlas Copco and Danaher with respect to Aetna's issuance of coverage for other periods, Atlas Copco and Danaher point to no case that has deemed the testimony of one employee of an alleged insured sufficient to establish the existence of a lost insurance policy. To the contrary,

Chicago Pneumatic's former treasurer's testimony, standing alone, is insufficient to establish as a matter of law the existence of the Aetna policies providing coverage from January 1, 1954 to January 1, 1956, even under the laxer preponderance of the evidence standard advocated for by Atlas Copco and Danaher.  Their motion for summary judgment with respect to the existence of Aetna insurance policies providing Chicago Pneumatic with primary coverage from January 1, 1954 to January 1, 1956 is therefore denied.

The Court's inquiry with respect to the aforementioned policy years is not yet finished.  Having concluded that Danaher and Atlas Copco have produced evidence sufficient to establish the *existence* of some of these policies as a matter of law, the Court still must assess whether the record sufficiently demonstrates the *terms* of each of these policies.  Instructive in this regard is the opinion of the New York Appellate Division, First Department, in *Estee Lauder Inc. v. OneBeacon Insurance Group, LLC*, 873 N.Y.S.2d 592 (App. Div. 1st Dep't 2009), *abrogated on other grounds*, *Keyspan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 23 N.Y.3d 583, 590 n.2 (2014).  In *Estee Lauder*, the court concluded that the alleged insured had "c[o]me forward with sufficient secondary evidence of [a lost] disputed [policy] . . . to establish the existence of the policy" for purposes of summary judgment.  *Id.* at 597–98.  This secondary evidence included "a renewal policy issued to [the insured] by [the insurer's] predecessor stating in the declaration page that the policy being renewed is the disputed policy . . . and two certificates of insurance signed by the predecessor . . . , both certifying, among other things, that the policy . . . was issued to [the insured]" during the relevant periods.  *Id.*  In addition, the court emphasized that the insurer had not "com[e] forward with evidentiary facts sufficient to raise any material issues of fact that would require denial of [the insured's] motion."  *Id.* at 598.

The *Estee Lauder* court then also concluded that this same evidence was sufficient "to invoke the presumption[] that the terms of the renewal policy [were] identical to the terms of the policy being renewed," and the court thus relied on the terms of the renewal policy to establish the terms of the unlocated policy.  *Id.*  In support of the applicability of this presumption, the *Estee Lauder* court cited case law from the New York Court of Appeals:

> Clearly, a policy which renews an old policy must renew the terms of that policy as they stood at the moment of expiration.  An agreement to *renew* a policy, implies that the terms of the existing policy are to be continued . . . in the absence of evidence, that a change was intended.

*Id.*  (omission in original) (quoting *L. Lewitt & Co. v. Jewelers' Safety Fund Soc'y*, 249 N.Y. 217, 222 (1928)).  Other courts around the country have similarly concluded that an alleged insured "can meet its burden of proof [with respect to the terms of a lost insurance policy] by introducing evidence that the unavailable policies are renewal policies because 'the renewal agreement is presumed to adopt and have reference to the terms of the existing or expiring policy.'"  *Ne. Utils. v. Century Indem. Co.,* No. X03CV 990495495S, 1999 WL 476274, *4 (Conn. Super. Ct. June 21, 1999) (quoting *Westchester Fire Ins. Co. v. Tantalo,* 273 F. Supp. 7, 17 (D. Conn. 1967)) (collecting cases).

Drawing guidance from these cases, the Court concludes that Danaher and Atlas Copco's unrebutted evidence showing that Chicago Pneumatic continuously obtained primary insurance policies from Aetna in the periods spanning from December 31, 1946 to January 1, 1954, from January 1, 1956 to January 1, 1961, and from January 1, 1962 to January 1, 1963, allows it "to invoke the presumption[] that the terms of the renewal policy are identical to the terms of the policy being renewed."  *Estee Lauder Inc.*, 873 N.Y.S.2d at 598.  Thus, as in *Estee Lauder*, here too it is reasonable to expect that the terms of subsequent policies, repeatedly issued by the same insurer year after year, would contain the same terms found in other policies issued for adjacent

years.  Moreover, Danaher and Atlas Copco may rely on the form Aetna policies they have

introduced (*see, e.g.* Dkt. No. 527-13) to supply the terms of the lost policies, as courts have

permitted the "use[] [of] a specimen policy introduced by the plaintiff as evidence of the terms of

the lost policies" under similar circumstances, *Glew v. Cigna Grp. Ins.*, 590 F. Supp. 2d 395, 413

(E.D.N.Y. 2008).  In sum, absent any evidence from Travelers sufficient to support any contrary

conclusion, Atlas Copco and Danaher's unrebutted evidence of Chicago Pneumatic's near-

continuous retention of primary insurance from Aetna may be used to establish, even under the

stricter clear and convincing evidentiary standard, that the terms of lost policies would have been

the same as those contained in policies from adjacent years or in form policies from the relevant

periods.

### C.      Aggregate Limits in Select Travelers Policies

Danaher and Atlas Copco move for a summary judgment ruling establishing the lack of

aggregate limits for coverage of bodily-injury claims in the Travelers policies covering the years

1970, 1971, and 1972.  (Dkt. No. 522 at 12–16.)  This portion of Danaher and Atlas Copco's

motion is joined by Excess Insurers American Home, Granite State, National Union, and

OneBeacon.  (Dkt. Nos. 541–42.)  Travelers opposes this portion of Danaher and Atlas Copco's

motion.  (Dkt. No. 618 at 23–25.)

"Under New York law, 'an insurance contract is interpreted to give effect to the intent of

the parties as expressed in the clear language of the contract'" and "[t]he initial interpretation of

a contract 'is a matter of law for the court to decide.'"  *Morgan Stanley Grp. Inc. v. New Eng.

Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (first quoting *Vill. of Sylvan Beach v. Travelers

Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995); second quoting *K. Bell & Assocs. v. Lloyd's

Underwriters,* 97 F.3d 632, 637 (2d Cir. 1996)).  "Insurance contracts must be interpreted

according to common speech and consistent with the reasonable expectations of the average

insured." *Cragg v. Allstate lndem. Corp.*, 17 N.Y.3d 118, 122 (2011). Unambiguous policy provisions are to be "given their plain and ordinary meaning." *Vigilant Ins. Co. v. Bear Stearns Cos.*, 10 N.Y.3d 170, 177 (2008) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007)). Policy language is unambiguous if it "provides a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Atl. Cas. Ins. Co. v. Value Waterproofing, Inc.*, 918 F. Supp. 2d 243, 253 (S.D.N.Y. 2013) (quoting *Olin Corp.,* 704 F.3d at 99). By way of contrast, "[a]n ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Morgan Stanley Grp.*, 225 F.3d at 275 (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir. 1997)). A court may rely on extrinsic evidence when interpreting an insurance provision only where the court has concluded that the provision is ambiguous. *Id.* at 275–76. If extrinsic evidence fails to resolve the ambiguity and the contract has been drafted by the insurer, "any ambiguity in [the] . . . policy should be resolved in favor of the insured." *Id.* at 276 (alterations in original) (quoting *McCostis v. Home Ins. Co. of Ind.,* 31 F.3d 110, 113 (2d Cir. 1994)).

The Travelers policies for these years provide in a "Comprehensive General Liability Insurance Coverage Part" that "the total liability of the company for all *damages* because of (1) all *bodily injury* included within the *completed operations hazard* and (2) all *bodily injury* included within the *products hazard* shall not exceed the limit of *bodily injury* stated in the declarations as 'aggregate.'" (Dkt. No. 527-5 at 7–8; *see also, e.g.*, Dkt. No. 527-6 at 8–9.) The declarations pages for each of these policies in turn provide no aggregate limit for coverage of

bodily-injury claims.  (*See* Dkt. No. 527-5 at 2; Dkt. No. 527-6 at 2; Dkt. No. 527-7 at 2.)

Instead, they provide strikethrough marks where aggregate limits for bodily-injury claims might

otherwise be listed.  (*See id.*)

Travelers points to no other provision of the relevant policies providing an aggregate

limit for coverage of bodily-injury claims.  To the contrary, Travelers' own designated

representative testified at his deposition upon reading the relevant policies that they revealed no

aggregate limit for bodily-injury liability.  (Dkt. No. 527-8 at 109:19–22, 111:2–12.)  Travelers

points to Travelers' designee's surprise at the lack of any such limit in the contracts, and some

extrinsic evidence of an aggregate limit of $1 million for the policy covering the year 1972, such

as the reference to an aggregate limit in certain excess insurance policies overlaying this

Travelers policy.  (*See* Dkt. No. 618 at 24–25.)  But the strikethrough marks in the places

designated by the Travelers policies themselves to provide aggregate limits for bodily-injury

claims, coupled with the policies' otherwise total silence with respect to the amount or existence

of any aggregate limit, unambiguously provide that the policies contain no such limits.  The

Court thus "determines that the terms at issue are unambiguous, [so] the terms are given their

plain and ordinary meaning and the court will not consider extrinsic evidence in aid of assigning

meaning to these terms."  *Atl. Cas. Ins. Co.*, 918 F. Supp. 2d at 253.  Because Travelers cannot

establish any ambiguity in the underlying policy terms themselves, Travelers' extrinsic evidence

must be disregarded.  *See Morgan Stanley Grp.*, 225 F.3d at 275–76.  Danaher and Atlas

Copco's motion for a summary judgment ruling declaring that Travelers' primary policies

covering January 1, 1970 through January 1, 1973 contain no aggregate limits of liability for

bodily injuries is therefore granted.

## V.	The Excess Insurer Motions

### A.	Justiciability

Excess Insurer Continental Casualty moves pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56(a) for dismissal of all claims against it for lack of standing, asserting that no party in this action has produced evidence sufficient to show a practical likelihood of triggering its policies.  (Dkt. Nos. 483, 484 at 13–20.)  Continental Casualty's motion has been joined in full by each Excess Insurer with respect to its own policies, with the lone exception of American Home.  (*See* Dkt. Nos. 488, 492, 496, 498, 503, 515, 520.)  These motions have been opposed by Travelers, Atlas Copco, and Danaher.  (Dkt. Nos. 609, 622.)

As Continental Casualty correctly notes (*see* Dkt. No. 484 at 14 n.7 & 15 n.8), there is currently some uncertainty in the Second Circuit with respect to the proper motion by which to present a fact-based jurisdictional or justiciability challenge to declaratory judgment claims premised on an excess insurer's coverage obligations, *see, e.g.*, *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001) (per curiam); *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 90 F.3d 671, 675–76 (2d Cir. 1996).  That said, "[t]he legal principles governing [such a] challenge are well-established."  *E.R. Squibb & Sons*, 241 F.3d at 177.  "A party seeking a declaratory judgment bears the burden of proving that the district court has jurisdiction," and "[j]urisdiction exists only if there is an 'actual controversy.'"  *Id.* (second quoting 28 U.S.C. § 2201)).  The party seeking a declaratory judgment with respect to another insurer's obligations "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  *Ill. Nat'l Ins. Co. v. Tutor Perini Corp.*, No. 11 Civ. 431, 2011 WL 4712079, at *2 (S.D.N.Y. Oct. 7, 2011) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir. 2005)).

Showing an "actual controversy" in the insurance-coverage context in a suit against an excess insurer requires a showing that "there [is] a 'practical likelihood' that [an] . . . excess carrier['s] policies [will] be reached." *E.R. Squibb & Sons*, 241 F.3d at 177. Because making such an assessment often requires some speculation as to the extent of liability for yet-unresolved underlying claims, the Second Circuit has explained that the fact that

> liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on the practical likelihood that the contingencies will occur[]. Indeed, litigation over insurance coverage has become the paradigm for asserting jurisdiction despite future contingencies that will determine whether a controversy ever actually becomes real.

*Id.* (alterations in original) (quoting *Associated Indem. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, 35 (2d Cir. 1992)). In assessing whether a "practical likelihood" exists under the New York laws governing insurance allocation, courts consider "the worst case or 'highest estimate of damages'" in order "to ascertain whether or not a claim is justiciable against a particular excess insurer's policy." *Long Island Lighting Co. v. Allianz Underwriters Ins. Co.,* 826 N.Y.S.2d 55, 56 (App. Div. 1st Dep't 2006) (quoting *Consol. Edison*, 98 N.Y.2d at 225)).

Each of the moving Excess Insurers issued excess policies to Chicago Pneumatic sitting above at least one primary insurance policy, and, in some cases, the Excess Insurers have issued upper-level excess policies that also sit above lower levels of excess insurance. (*See generally* Dkt. No. 622 at 5–13 (surveying Excess Insurer policies).) For example, the Continental Casualty policy at issue, which provides coverage from April 7, 1972 to April 7, 1975, is a second-layer excess policy with a liability limit of "$5,000,000 per occurrence [and] $5,000,000 aggregate which is excess of primary coverage." (Dkt. No. 485-1.) According to Continental Casualty's survey of the primary and first-layer excess insurance coverage underlying its policy, there is a "a total of $18 million in underlying coverage, for the three-year policy period of the

Continental [Casualty] Policy" at issue. (Dkt. No. 484 at 6.) But even assuming the accuracy of this figure, Danaher and Atlas Copco have made a sufficient showing of the existence of a practical likelihood of Continental Casualty's policy being triggered for purposes of maintaining a declaratory-judgment claim against it. This is true for two interrelated reasons.

First, the uncertainties attendant to the risks posed by the Underlying Claims, which include hundreds of live and unresolved claims and innumerable more claims still likely to be filed, precludes the Court from concluding that there is no practical likelihood that any of the Excess Insurers' policies will be triggered. Continental Casualty performs numerous calculations based on different allocation methods that show that the likeliest trigger dates for its policy lie centuries into the future — but these calculations are, of necessity, based exclusively on existing liabilities resulting from already settled claims. (*See generally* Dkt. No. 484 at 16–20.) Accordingly, Continental Casualty's data fails to account for the contingencies inherent in the ongoing litigation of the hundreds of live asbestos suits against Chicago Pneumatic, suits that are continuously being filed and will likely continue to be filed for years to come. (Dkt. Nos. 485-9, 485-10, 485-11, 485-12 (surveying claims data in recent years); Dkt. No. 484 at 12 (calculating approximately 70 new Asbestos Claims per year based on that data); Dkt. No. 611 ¶ 6.) Continental Casualty's calculations also fail to account for the possibility of new outlier claims, ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████. (*See* Dkt. No. 485-9 at 7; *see also* Dkt. No. 611 ¶¶ 23–24 (noting that another Danaher subsidiary recently lost an asbestos case with a jury verdict of $25 million).) The Second Circuit has made clear that the fact that "liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action," and instead that "courts should

focus on the practical likelihood that the contingencies will occur." *E.R. Squibb & Sons*, 241 F.3d at 177 (quoting *Associated Indem. Corp.*, 961 F.2d at 35). Here, the ever-growing number of Underlying Claims, and the extent of Chicago Pneumatic's exposure to those claims, precludes the Court from holding that there is no practical likelihood that any Excess Insurer's policy will be reached by any single Underlying Claim, let alone all of them together once finally resolved.

This decision accords with the manner in which the Second Circuit has assessed similar attacks on subject-matter jurisdiction of declaratory judgment claims brought against insurers. Those cases cited by Continental Casualty in which declaratory judgment claims against insurers have been dismissed for a want of "practical likelihood" involve closed universes of underlying claims with a definitive and finite level of exposure, or cases where there were serious defenses to the underlying liability that could be assessed on the merits. *See, e.g.*, *Certain Underwriters at Lloyd's, London*, 90 F.3d at 673–74 (dismissing dispute over coverage for environmental contamination claims where the insured faced claims involving a known set of twenty contaminated sites, where the insured "produced little evidence to demonstrate the likely magnitude of [its] liability at these sites," and where the insured had specific and known viable defenses to the underlying liability); *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993) ("Other than the controversy over the Pennsylvania site, we can find no mention of any pending environmental claim as to any third-party site in the pleadings or record."). In contrast, the Second Circuit has found an actual case or controversy where there were hundreds of "claims . . . still pending against [an insured], and [the insured's] expert averred that it was reasonable to predict that [the insured] would incur . . . additional . . . indemnity and defense expenses in the future" at twice the highest trigger point of any of the insured's excess policies.

*E.R. Squibb & Sons*, 241 F.3d at 177–78.  Here, the history of the Underlying Claims, the number of such claims remaining unsettled, and Danaher and Atlas Copco's expert evidence outlining the uncertainty of Chicago Pneumatic's future obligations, together satisfy Danaher and Atlas Copco's burden of demonstrating a practical likelihood of future liabilities in excess of the trigger points for any one of Chicago Pneumatic's pre-acquisition insurance policies.  (*See, e.g.* Dkt. No. 485-12, 611 (demonstrating millions of dollars of existing liability, hundreds of pending claims, the likelihood of hundreds of new claims being filed in years to come, and the possibility of individual outlier claims resulting in millions of dollars of new liability).)

Second, the New York Court of Appeals' recent decision in *Viking Pump*, and even more particularly, the Second Circuit's interpretation of *Viking Pump*'s implications for excess insurers whose policies with non-cumulation clauses sit above primary policies lacking such clauses, buttress this conclusion.[7]  *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 144–45 (2d Cir. 2017).  As relevant here, the New York Court of Appeals in *Viking Pump* endorsed what is known as "vertical exhaustion" for purposes of an insured's ability to access higher level excess policies subject to all sums allocation, at least where an excess policy's trigger point is explicitly tied to the limits of specific underlying policies.  *In re Viking Pump*, 27 N.Y.3d at 267.  "Vertical exhaustion" allows an insured to "access each excess policy once the immediately underlying policies' limits are depleted, even if other lower-level policies during different policy periods remain unexhausted."  *Id.* at 264, 267.

---

[7] Danaher and Atlas Copco provide a survey of each of the Excess Insurers' policies' non-cumulation clauses, and each such policy contains language comparable to the non-cumulation clause language analyzed by the New York Court of Appeals in *Viking Pump*.  (Dkt. No. 522-1.)  No Excess Insurer contends that any of its own policies, if triggered, would be subject to pro rata allocation under *Viking Pump*.

*Olin*, a subsequent Second Circuit case applying *Viking Pump*, involved an excess insurer whose policy was deemed to be subject to all sums allocation under *Viking Pump*, because the *Olin* insurer's policy contained a non-cumulation provision identical to the provision at issue in *Viking Pump*. *Compare Olin Corp.*, 864 F.3d at 137–38, 144, *with In re Viking Pump*, 27 N.Y.3d at 252–53. The Second Circuit in *Olin* was then called upon by that excess insurer to address the insurer's proposal of a new so-called "'hybrid' allocation/exhaustion scheme," on the grounds that the primary policy underlying that excess insurer's policy was subject to pro rata allocation. *Olin Corp.*, 864 F.3d at 144. The excess insurer in *Olin* contended that because the court was required to "use pro rata allocation to determine whether the underlying primary policies [had] been exhausted (and thus whether [the excess insurer's own] policies [had] attached)," an excess insurer's policies could not be triggered until *every* primary policy that bore some pro rata share of the expenses incurred during the relevant policy period had been exhausted. *Id.* Only once it had been so triggered could "all sums allocation apply to [the] excess policies." *Id.*

The Second Circuit in *Olin* flatly rejected the "hybrid" proposal sought by the excess insurer before it, and held instead that "the New York Court of Appeals' decision in *Viking Pump* dictates vertical exhaustion where the all sums approach is the proper method for allocation." *Id.* In other words, the fact that some primary policies that are subject to pro rata allocation have not yet been exhausted cannot be used by an excess insurer whose own policy calls for all sums allocation and is triggered to avoid assuming joint and several liability for any covered losses. *Id.* Instead, where an excess insurer's policy calls for all sums allocation, "an insured may simply tap a particular tower of its insurance program triggered by an occurrence and proceed up the tower upon depletion of the policies within each layer of coverage." *Id.* at

145.  In practice, this allows an insured to collect from any excess insurer up to its "total remediation costs, less [the coverage limits of the directly underlying policies], . . . with [the insured's] total recovery capped only by the relevant policy limits" in the excess policy.  *Id.* at 147.

The availability of this method of recovery to Danaher and Atlas Copco, a method of recovery referred to by the parties in briefing the instant motion as "spiking" (*see* Dkt. No. 484 at 22–23; Dkt. No. 609 at 11–12), heightens the practical likelihood of any given Excess Insurer's policies being triggered.  Rather than needing to wait for each and every one of Chicago Pneumatic's primary policies or lower-level excess policies to exhaust prior to having its own policies triggered, any higher-level Excess Insurer is subject to having its policies triggered via the "spiking" of any single loss exceeding the remaining limits of any policies upon which the Excess Insurer's policies rest.  Continental Casualty notes that should Danaher or Atlas Copco choose to so "spike" one Excess Insurer policy, that insurer could then "flatten the spike" by seeking contribution from other Excess Insurers similarly exposed by the relevant loss.  (Dkt. No. 484 at 22–23.)  While a spiked Excess Insurer may in effect flatten the spike by "seek[ing] contribution from the insurers that issued the other triggered policies," *Olin Corp.*, 864 F.3d at 151 (quoting *Viking Pump*, 27 N.Y.3d at 256), flattening the spike does not undo the initial triggering of the spiked policy.  By the time an Excess Insurer "flattens the spike," its own policy will necessarily have already been triggered, and it will be entitled to seek contribution pursuant to *Viking Pump* only if it has already paid any losses assigned to its policy.  The right to "flatten the spike" thus has no bearing on the Court's "practical likelihood" analysis.

In sum, the fact that Chicago Pneumatic at this moment in time faces hundreds of ongoing litigations, any one of which may trigger tens of millions of dollars of liability, in

conjunction with the ability of Danaher and Atlas Copco to assign all of that liability to any single Excess Insurer whose policy contains a non-cumulation clause so long as the liability at issue exceeds the coverage limits of the lower-level policy upon which the excess policy sits, is sufficient to establish a practical likelihood of triggering sufficient to establish this Court's subject matter jurisdiction over the declaratory judgment claims against the Excess Insurers. Accordingly, the Excess Insurers' motions to have all such claims against them in this action be dismissed due to the lack of a justiciable controversy are denied.

        **B.**        **NR's Motion**

NR, in addition to joining Continental Casualty's motion with respect to NR's untriggered policies, separately moves for summary judgment with respect to the methods of allocation and extent of contribution it might owe to Travelers pursuant to its currently triggered policies.  (Dkt. No. 532 at 1.)  Ultimately, most of NR's contentions have been resolved by the Court in addressing Travelers' and Danaher and Atlas Copco's motions for partial summary judgment.  *See supra* Sections III.A–C, IV.A.  To avoid any confusion, the Court briefly reviews its disposition of the contentions in NR's motion here.

NR first contends that Travelers, as a primary insurer, has no right to contribution from NR, because NR is an excess insurer.  (Dkt. No. 532 at 6–9.)  For reasons already explained, *see supra* Section III.B., Travelers has an immediate right to contribution for both indemnity and defense costs from NR for those years in which NR's policy has been triggered, because NR no longer stands in the shoes of an excess insurer for those years.  The terms of the triggered NR policy provide that once the primary insurance policies underlying it has been exhausted, the NR policy "*shall apply as underlying insurance*, notwithstanding anything to the contrary in the terms and conditions of th[e] polic[ies]" (Dkt. No. 575-1 at 6 & Dkt. No. 575-2 at 7 (emphasis added)), confirming the propriety of this conclusion.  The triggered NR policy also provides that

NR will "[d]efend any suit against the Insured [*i.e.*, Chicago Pneumatic] seeking damages on account of personal injuries" covered by the policy. (Dkt. No. 575-2 at 4.) Based on the plain and unambiguous terms of the triggered NR policy, the Court concludes that NR at this moment stands in the shoes of a primary insurer of Chicago Pneumatic from April 1, 1979 to April 1, 1982 with respect to its obligation to defend and indemnify the Underlying Claims. *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, No. 82 Civ. 7327, 1992 WL 133899, at *8 (S.D.N.Y. Apr. 21, 1992) ("[W]here a clause in an [excess insurer's] policy provides that coverage 'shall apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions of this policy,' no prohibition on liability for legal defense costs in that policy shall be applicable where the conditions for applicability of the quoted clause are met."). Travelers is thus presently entitled to contribution from NR for defense and indemnity costs paid by Travelers and allocable to the years covered by the triggered NR policy.

To the extent that NR argues that it should not be required to reimburse Travelers for defense costs incurred prior to the time NR's policies are triggered (Dkt. No. 532 at 9), the Court agrees. Indeed, so does Travelers. (*See* Dkt. No. 606 at 8 n.3 (confirming that Travelers "does not seek contribution from [NR] for any such defense costs).) Travelers may seek contribution for defense costs from NR only to the extent that NR is or was at the time those costs were expended "on the risk" for any liability posed by the claims being defended.

NR also argues that the "Ultimate Net Loss" provision in its policies requires that it reimburse Travelers only for those defense costs associated with Travelers' defense of "occurrences" covered by NR's policies. (Dkt. No. 532 at 10–14.) The "Ultimate Net Loss" provisions in NR's policies specifically provide that NR will be responsible for its insured's legal fees only where those fees "are paid as a consequence of any occurrence covered" by the

policies, and the NR policies in turn define covered occurrences as those shown to actually "result[] in personal injury." (*See, e.g.*, Dkt. No. 538-1 at 12; Dkt. No. 538-2 at 15.) In support of its argument that this language places an enforceable limitation on the extent of NR's contribution to defense costs, NR relies on the *Stonewall* court's holding that "under policies containing a duty to reimburse defense costs but not a duty to defend, . . . [i]nsurers have a duty to reimburse defense costs for claims that are established to be covered through judgment and settlement, and not for claims only potentially falling within the policy's coverage." *Stonewall*, 73 F.3d at 1219. But while *Stonewall* did involve insurance policies with "Ultimate Net Loss" provisions similar to NR's, *Stonewall* is inapposite by virtue of the clear and unambiguous duty to defend contained in NR's policies. (Dkt. No. 575-2 at 4.) NR's policy is thus not one that can be said to "contain[] a duty to reimburse defense costs but not a duty to defend." *Stonewall*, 73 F.3d at 1219. Instead, NR's policies, like those from *E.R. Squibb*, provide that they are to "function as underlying insurance under certain circumstances, [and] for legal defense or defense costs to be payable in certain instances," and "these provisions override any conflicting provisions in the same policy excluding legal defense or legal expense coverage." *E.R. Squibb*, 1992 WL 133899, at *8.

In sum, because NR's triggered policy contains a duty to defend and because NR's triggered policy at this time "assume[s] the same risk" as Travelers' unexhausted policies, "both must contribute, pro rata, toward payment of . . . legal fees and other expenses of the litigation." *Fed. Ins. Co.*, 25 N.Y.2d at 78–79. Pursuant to the New York Court of Appeals' decision in *Continental Casualty Company v. Rapid-American Corp.*, 80 N.Y.2d 640, 655–56 (1993), holding that "when more than one policy is triggered by a claim, pro rata sharing of defense costs may be ordered," but also allowing that courts may "declin[e] to order such sharing, with the

understanding that the insurer may later obtain contribution from other applicable policies," *id.*, this Court has ordered Travelers to defend all of the Underlying Claims in the first instance, with the understanding that Travelers might eventually obtain contribution from excess insurers with triggered policies (Dkt. No. 575-6 at 58–61.)  For the reasons explained above, the Court now holds that NR may indeed be held liable to provide contribution to Travelers for NR's pro rata share of defense costs that Travelers has expended to date in connection with claims for which NR now sits in the shoes of a primary insurer.  *See supra* Section III.B.

Finally, to the extent that NR would have the Court require that Danaher and/or Atlas Copco demonstrate a triggering "injury-in-fact" for each Underlying Claim under the *Keasbey* injury-in-fact framework (Dkt. No. 532 at 14–15), the Court rejects those arguments for the reasons explained above, *see supra* Section III.C.

C.      **Wausau's Motion**

In addition to its joinder in Continental Casualty's motion, Wausau makes an additional argument that it should be dismissed from this case on the basis of an asbestos exclusion contained in one of its policies.  (*See* Dkt. No. 499 at 16–18.)  The exclusion at issue is found in one of Wausau's policies providing Chicago Pneumatic with excess coverage from April 1, 1985, to April 1, 1986, and it provides:  "It is agreed that this policy does not apply to any claim arising from asbestos or any other materials containing asbestos.  It is further agreed that the underlying insurance will not be diminished by any asbestos related losses."  (Dkt. No. 500-8 at 4.)

The Court agrees with Wausau that this clause unambiguously excludes asbestos claims from the scope of coverage provided by the policy reproduced at Docket Number 500-8, referred to by the parties as Policy Number 5276-00-102661.  (*See* Dkt. No. 622 at 13 n.8.)  However, Wausau also issued two other excess policies to Chicago Pneumatic, each of which also provided

Chicago Pneumatic with excess coverage for the period spanning from April 1, 1985, to April 1, 1986.  (Dkt. Nos. 500-9, 500-10.)  Neither of these latter two policies contains an asbestos exclusion.  Because either of these two Wausau-issued policies would provide coverage for the Asbestos Claims if triggered, the presence of an asbestos exclusion in another of Wausau's policies provides no basis for dismissing Wausau from this case.

## VI.    The Post-Acquisition Insurer Motions

Post-Acquisition Insurers Trygg-Hansa, Zurich, Century, and Liberty Mutual have each filed motions for summary judgment on a variety of different grounds with respect to Travelers' claims against them.  (*See* Dkt. Nos. 504, 517, 529, 551.)  The Court need only address one, which is dispositive as to all of Travelers' claims against the Post-Acquisition Insurers: that Travelers' claims would lead only to what Judge Learned Hand has termed the "'complete circuity of action' . . . defense to a judgment in an insurance action."  *Wal-Mart Stores, Inc. v. RLI Ins. Co.*, 292 F.3d 584, 594 (8th Cir. 2002) (quoting *Md. Cas. Co. v. Emp'rs Mut. Liab. Ins. Co. of Wis.,* 208 F.2d 731, 733 (2d Cir. 1953)).  "Generally, courts will not allow parties to engage in circuitous action when the foreseeable end result is to put the parties back in the same position in which they began."  *Id.*  To that end, courts have dismissed contribution claims where the claimant-insurer's insured had previously agreed to indemnify the insured of the party against whom contribution is sought.  *Id.* at 593–95; *see also, e.g.*, *Wallace v. Nat'l R.R. Passenger Corp.*, 5 F. Supp. 3d 452, 482 (S.D.N.Y. 2014) ("[C]ourts have consistently held that an indemnitor (and thus its insurer) bears full responsibility for covered indemnification payments, even if the indemnitee has other insurance covering the same loss.") (collecting cases); *Indem. Ins. Co. of N. Am. v. St. Paul Mercury Ins. Co.*, 900 N.Y.S.2d 24, 26 (App. Div. 1st Dep't 2010) (holding that an indemnitee's insurance would not attach until indemnitor's and

indemnitor's insurers' obligations had been exhausted, as indemnitor had "unconditionally and without reservation agreed to defend and indemnify the" indemnitee).

The Post-Acquisition Insurers all insure a party (Atlas Copco) that is indemnified for the losses at issue by another party in this action (Danaher) pursuant to the SPA's Indemnification Clause. (Dkt. No. 564-2 at 11, 13, 24.) Pursuant to Section 11(h) of the SPA, Danaher may seek to offset its indemnification obligations with respect to the Underlying Claims by recovering from Chicago Pneumatic the net amount of "all damages covered by the insurance policies owned by the [Chicago Pneumatic] Group *prior to the Closing Date*" of the SPA. (Dkt. No. 564-2 at 24 (emphasis added).) The Post-Acquisition Insurers do not fall within the group of insurers against which Danaher's indemnification obligations are offset. It would thus be circuitous to allow Travelers to obtain contribution from the Post-Acquisition Insurers, only to have the Post-Acquisition Insurers in turn seek indemnification from Danaher pursuant to Danaher's obligations under the SPA, and for Danaher to then seek that same amount from Travelers or the Excess Insurers pursuant to their insurance-coverage obligations to Chicago Pneumatic. Such a "litigation [would] clearly [be] circular and would not ultimately change the parties' obligations from their pre-suit positions." *Wal-Mart Stores, Inc.*, 292 F.3d at 594. To permit Travelers to pursue such circular claims would be to "allow parties to engage in circuitous action when the foreseeable end result is to put the parties back in the same position in which they began." *Id.*

Instead, the appropriate course is to allocate any costs stemming from the Underlying Claims attributable to years following Atlas Copco's acquisition of Chicago Pneumatic to Danaher, Travelers, or the Excess Insurers in the first instance, pursuant to Danaher's obligations to indemnify Atlas Copco for such losses net of Chicago Pneumatic's pre-acquisition insurance,

rather than encroach upon Atlas Copco's insurance limits.  Indeed, both Danaher and Atlas

Copco also agree that "because it would be inconsistent with the intent of their indemnity

agreement, . . . Travelers cannot seek contribution from the post-acquisition insurance purchased

by the indemnitee," namely Atlas Copco.  (Dkt. No. 600 at 4.)  And this conclusion is

particularly justified here, because Atlas Copco negotiated and purchased its coverage from the

Post-Acquisition Insurers in explicit reliance on this understanding of the SPA, namely that the

losses at issue in this suit would fall to Danaher in the first instance, and not to Atlas Copco or

the Post-Acquisition Insurers.  (*See, e.g.*, Dkt. No. 644-2 (letter from Atlas Copco to Trygg-

Hansa explaining that Trygg-Hansa's "encumbrance from [Chicago Pneumatic] will be minimal

in the early years" due to the fact that Danaher would "be liable for damages that occur with

products that were manufactured before [Atlas Copco's] acquisition" (formatting omitted)).)

This conclusion suffices to resolve both of Travelers' causes of action against the Post-

Acquisition Insurers.  First, Travelers asserts contribution claims against the Post-Acquisition

Insurers with respect to defense costs.  (Dkt. No. 455 ¶¶ 50–57.)  Travelers' contribution cause

of action is not based upon contract; rather, it is based upon equitable principles. *See Md. Cas.

Co.*, 218 F.3d at 210–11.  And the "controlling inquiry under [this] equitable analysis is whether

one party is unjustly enriched at the expense of another — the law abhors unjust enrichment."

*Id.* at 212.  Here, as the Court's explication of the priorities of the parties' varying obligations

makes clear, the Post-Acquisition Insurers have not been unjustly enriched by Travelers'

payment of defense and indemnity costs in connection with the Underlying Claims.  To the

contrary, because the Post-Acquisition Insurers sit far below all other parties in this action with

respect to each's respective obligations, no Post-Acquisition Insurer may be said to have "money

which it should not retain, but should under equitable principles turn over to another." *Id.*
Travelers' contribution claim against the Post-Acquisition Insurers thus fails as a matter of law.

Second, Travelers seeks to allocate indemnity costs to the Post-Acquisition Insurers, and
to that end seeks a declaration of the Post-Acquisition Insurers' obligations with respect to
indemnifying the Underlying Claims. (Dkt. No. 455 ¶¶ 58–62.) As the Court has already
explained, this Court may adjudicate such a declaratory judgment claim only if there is a
"practical likelihood" that the Post-Acquisition Insurers' obligations will be triggered by the
Underlying Claims. *E.R. Squibb & Sons*, 241 F.3d at 177. No such practical likelihood can be
said to exist here. The Post-Acquisition Insurers' obligations can be triggered at the earliest
upon the exhaustion of Danaher's indemnity obligation to Atlas Copco, which could total as
much as the more than $88 million purchase price Atlas Copco paid to Danaher for Chicago
Pneumatic. (Dkt. No. 564-2 at 11, 13; Dkt. No. 533-1 at 2–3.) Furthermore, Danaher's
indemnity obligation is itself net of Chicago Pneumatic's pre-acquisition insurers' obligations
with respect to the Underlying Claims (Dkt. No. 564-2 at 24), meaning that Travelers' and the
Excess Insurers' combined hundreds of millions of dollars of obligations with respect to the
Underlying Claims must exhaust *and* Danaher's approximately $88 million indemnification
obligation with respect to the Underlying Claims must exhaust prior to the Post-Acquisition
Insurers' obligations being triggered. While the possibility of some outlier claims in the tens of
millions of dollars, combined with Danaher and Atlas Copco's legal right to "spike" all of those
losses into a single Excess Insurer's policy, sufficed to create a practical likelihood of reaching
any of the Excess Insurers' policies, *see supra* Section V.A., a different conclusion is warranted
here. Because the Post-Acquisition Insurers' obligations with respect to the Underlying Claims
will not attach until *all* pre-acquisition insurance and Danaher's own indemnification obligations

have lapsed, even a number of outlier claims would likely be insufficient to trigger any of the Post-Acquisition Insurers' policies. And there is no evidence in the summary judgment record sufficient to establish a "practical likelihood" of there being the many dozens of such outlier claims that would be necessary to exhaust all the obligations preceding those of the Post-Acquisition Insurers with respect to the Underlying Claims. Travelers' declaratory judgment claims against the Post-Acquisition Insurers are therefore dismissed for want of subject matter jurisdiction.

## VII.    Conclusion

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the parties' arguments are either premature, moot, or without merit. For the foregoing reasons, Plaintiff Danaher and Third-Party Defendant Atlas Copco's motion for partial summary judgment (Dkt. No. 519) is GRANTED in part and DENIED in part; Defendant and Third-Party Plaintiff Travelers' motion for partial summary judgment (Dkt. No. 510) is GRANTED in part and DENIED in part; the Excess Insurers' motions for summary judgment (Dkt. Nos. 483, 488, 492, 496, 498, 503, 515, 520, 531) are DENIED; and the Post-Acquisition Insurers' motions for summary judgment (Dkt. Nos. 504, 517, 529, 551) are GRANTED.

The parties are directed to meet and confer regarding further proceedings. On or before November 8, 2019, the parties shall submit a joint status letter not exceeding ten (10) pages addressing the parties' proposals regarding further proceedings. Any such status letter shall address Danaher, Atlas Copco, and Travelers' joint suggestion (Dkt. No. 522 at 24; Dkt. No. 618 at 16) that the Court at this time refer this matter for supplemental allocation proceedings, to be conducted in a manner consistent with this opinion.

The Clerk of Court is directed to close the motions at Docket Numbers 483, 488, 492, 496, 498, 503, 504, 510, 515, 517, 519, 520, 529, 531, and 551.

SO ORDERED.

Dated: October 10, 2019
New York, New York

J. PAUL OETKEN
United States District Judge

(Redacted version placed on the docket on October 31, 2019.)